173 F.3d 274
 134 Ed. Law Rep. 52
 Jane DOE, By their next friends Susan DOE, Mary Doe & Lisa
Doe; June Doe, By their next friends Susan Doe, Mary Doe &
Lisa Doe; Janet Doe, By their next friends Susan Doe, Mary
Doe & Lisa Doe; Jill Doe, By their next friends Susan Doe,
Mary Doe & Lisa Doe, Plaintiffs-Appellants,
v.
BEAUMONT INDEPENDENT SCHOOL DISTRICT, Defendant-Appellee.
 No. 97-40429.
 United States Court of Appeals,
Fifth Circuit.
 April 16, 1999.
 
 Scott David Newar, Houston, TX, for Plaintiffs-Appellants.
 Melody Gayle Thomas, Tanner Truett Hunt, Jr., J. Mitchell Smith, Wells, Peyton, Greenberg & Hunt, Beaumont, TX, for Defendant-Appellee.
 Mark S. Finkelstein, John D. Faucher, Shannon, Martin, Finkelstein & Sayre, Houston, TX, for Anti-Defamation League, Amicus Curiae.
 Steven Keith Green, Washington, DC, for Americans United for Separation of Church and State, Amicus Curiae.
 Appeal from the United States District Court for the Eastern District of Texas.
 Before WIENER, EMILIO M. GARZA and BENAVIDES, Circuit Judges.
 WIENER, Circuit Judge:
 
 
 1
 Plaintiffs-Appellants Jane Doe, June Doe, Janet Doe and Jill Doe (collectively "the Does" or "the Doe children"), by their next friends, Susan Doe, Mary Doe and Lisa Doe (collectively "the Doe Parents")[1] appeal the district court's grant of summary judgment in favor of Defendant-Appellee Beaumont Independent School District ("BISD"). The Does argue that the court erred in concluding that (1) they lack standing to challenge BISD's "Clergy in Schools" volunteer counseling program ("the Program"), and (2) the Program does not violate the First Amendment's Establishment Clause. We conclude that the Does have standing to bring this action and that summary judgment in favor of BISD was improvidently granted by the district court. Furthermore, on the basis of the undisputed material facts presented in connection with BISD's summary judgment motion,[2] we conclude that judgment should be entered against BISD, holding the Program to be unconstitutional. We therefore reverse the rulings of the district court, holding for the Does on both standing and constitutionality, and remand this case to the district court for (a) entry of judgment consistent with this opinion, (b) determination of reasonable attorneys' fees and costs to award to the Does, as prevailing parties, and (3) issuance of any orders that may be necessary or desirable to prohibit BISD from conducting the Program, which today we hold unconstitutional.
 
 
 2
 * FACTS AND PROCEEDINGS
 
 
 3
 Dr. Carrol Thomas, Jr., superintendent of BISD, initiated the "Clergy in the Schools" program soon after he was hired in March 1996. Under the Program, BISD invites individual members of the local clergy to provide volunteer counseling to students at the schools during school hours. The Program is an adjunct to--but entirely separate and distinct from--BISD's broader School Volunteer Program, which comprises a number of different groups[3] dedicated to furthering quality education by providing community resources and expertise. Although individual members of the clergy can participate in BISD's general volunteer program, the "Clergy in the Schools" program, as its name would indicate, is open only to clergymen. BISD rationalizes this restriction by advancing that it is designed to take advantage of the clergy's special listening and communication skills.[4]
 
 
 4
 The Program's stated goals are to provide (1) meaningful dialogue between the clergy and students regarding civic virtues and morality; (2) a safe school atmosphere; and (3) volunteer opportunities for an additional group of stakeholders in the public schools. BISD actively recruits selected area clergymen, inviting their participation through letters sent at taxpayer expense on official letterhead. The vast majority of the clergymen recruited by BISD are Protestant Christians. BISD asserts that it is committed to assembling a group that is both racially and religiously diverse and that the local predominance of Protestant Christians accounts for their disproportionate presence in the Program.
 
 
 5
 BISD administrators actively train the clergy volunteers. As part of this training, BISD provides the clergymen with written guidelines, which, inter alia, instruct the clergy not to (1) discuss religion, (2) quote religious materials, (3) provide information about church services, (4) identify their church affiliation, or (5) wear distinctive garb that would reveal their religious affiliation. In addition, BISD officials inform the clergy that they are not to offer to pray with students, and that any student who asked for prayer should be encouraged to share that need with a parent or with his individual clergyman outside school. Finally, the BISD administrators admonish the clergymen that discussions are to center on civic values; the volunteers are to refuse to discuss prohibited subjects, such as sex and abortion, but are encouraged to discuss, inter alia, divorce.[5]
 
 
 6
 At one training session, a leaflet entitled "Reasons for a School-Church Alliance" was distributed to the clergy. The document cites the benefits to children of regularly attending church and religious schools and concludes that "a strong RELIGIOUS base enhances education for socioeconomically disadvantaged children!"[6] BISD insists that this document was provided by a third party at an initial organizational meeting that was held off school property, and that Dr. Thomas has now informed the clergy by letter that the leaflet is not part of the program.
 
 
 7
 The Program calls for each elementary school to be visited by members of the clergy once a year and for each secondary school to be visited twice a year. Before each visit, the participating clergymen meet at a local church to discuss issues important to the Program and to receive additional training and orientation by BISD administrators. At one such meeting, BISD's attorney advised the volunteers regarding the constitutionality of the Program. These meetings, which are not attended by students, conclude with a prayer.
 
 
 8
 When the members of the clergy arrive on campus, they are escorted into the schools by BISD principals and counselors. The principal and counselor of each school select the student participants, with an eye toward assembling a group diverse in ethnicity, academic ability, and school deportment. BISD officials then remove the selected students from class and assemble them in another schoolroom to participate in the group counseling, without parental notification or consent.[7] According to BISD, students who are selected have the option of declining to participate. Each counseling session is attended by the school's principal and counselor. Under the Program's guidelines, the sessions are designed to comprise approximately thirty-five students and ten to twelve volunteer clergymen; the guidelines proscribe one-on-one meetings. According to the Does, however, on one occasion, a single clergymen counseled five students.[8]
 
 
 9
 At the counseling sessions, members of the clergy introduce themselves without referring to their titles, and students present topics of concern to themselves. School administrators attend and monitor every counseling session. BISD has on at least one occasion sought participation by the clergy in off-campus volunteer efforts. At a training meeting, Superintendent Thomas told the clergy that their help was needed in ensuring student success on the Texas Assessment of Academic Skills achievement test, and suggested that the clergymen offer tutorial sessions in church and include writing in Sunday school classes. BISD did not make such suggestions to the lay volunteers in the broader volunteer program.
 
 
 10
 The Doe Parents, on behalf of their minor children, filed suit against BISD. Shortly thereafter, they filed a motion for a Temporary Restraining Order ("TRO") to enjoin BISD from implementing the Program in the children's schools. After conducting a hearing, the court denied this motion, which denial the Does appealed. The Does next filed an Emergency Motion to Stay Denial of TRO, which likewise was denied. With the court's permission, the Does then withdrew their notice of appeal. Several months later, without entertaining oral argument, the district court granted BISD's motion for summary judgment. The court did not mention whether the Program violated the Texas Constitution--a claim that the Does continue to raise on appeal.
 
 
 11
 The Does timely appealed. Americans United for Separation of Church and State ("Americans United") and the Anti-Defamation League ("ADL") submitted amicus curiae briefs on behalf of the Does.
 
 II
 ANALYSIS
 A. Standard of Review
 
 12
 "We review a grant of summary judgment de novo, applying the same standard used by the district court, and in reviewing the facts, we draw all inferences most favorable to the party opposing the motion."[9] Summary judgment is appropriate when no genuine issue as to any material fact has been shown, and the moving party is entitled to judgment as a matter of law.[10]
 
 B. Standing
 
 13
 The district court held that the Does lack standing to bring this action under Article III of the Constitution. Purporting to consider the evidence in the light most favorable to the non-movant, the district court found that the Does had failed to identify a personal injury suffered or threatened as a result of BISD's program. Instead, concluded the court, they presented only a generalized public grievance. The court cited the Supreme Court's opinion in Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.[11] for the proposition that federal courts are not the proper forums for public grievances.[12]
 
 1. Legal Standards
 
 14
 "To establish standing under Article III of the United States Constitution, a litigant must demonstrate: that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant ... that the injury fairly can be traced to the challenged action and [that the injury] 'is likely to be redressed by a favorable decision.' "[13] The actual injury requirement ensures that issues will be resolved "not in the rarified atmosphere of a debating society, but in a concrete factual context...."[14]
 
 
 15
 Trial courts are exhorted to consider three prudential concerns when making a determination of standing: "1) whether the plaintiff's complaint falls within the zone of interests protected by the statute or constitutional provision at issue; 2) whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately resolved by the legislative branches; and 3) whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties."[15]
 
 
 16
 In Valley Forge, the Supreme Court held that respondents--an organization dedicated to the separation of church and state and certain of the organization's employees--did not have standing either as taxpayers or as citizens to challenge the conveyance of federally owned property in Pennsylvania to a church-related college. The respondents, none of whom lived in Pennsylvania, learned of the conveyance through a press release. The Court commented that the respondents could claim nothing more than that a violation of the Constitution had occurred: "They fail[ed] to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees."[16] Such attenuated psychological injury is insufficient to establish standing under Article III.[17] "[S]tanding is not measured by the intensity of the litigant's interest or the fervor of his advocacy."[18] The Court's express statement that standing may be predicated on noneconomic injury[19] does not alter the requirement that the injury still must be direct and personal.[20]
 
 
 17
 With regard to taxpayer standing, we stated in Doe v. Duncanville Independent School District[21] that to establish state or municipal taxpayer standing to challenge an Establishment Clause violation, a plaintiff must show only that (1) he pays taxes to the relevant entity, and (2) tax revenues are expended on the disputed practice.[22] By contrast, to establish federal taxpayer standing, a plaintiff must, in addition to meeting those two requirements, show "direct injury."[23]
 
 2. Analysis
 
 18
 BISD argues that, because no Doe has been selected to participate in the Program and because no Doe or Doe Parent is acquainted with any student who has participated,[24] the Does lack private litigant standing to bring this suit. BISD rests its argument on the twin pillars of Duncanville and Valley Forge. In Duncanville, after first rejecting the plaintiff's claim of taxpayer standing, we stated that the record would not support standing based on the student's exposure to Bible distribution by the Gideons.[25] In so doing, we noted that the student plaintiff in Duncanville had not attended the fifth grade (the only grade to which Bibles were distributed) in the subject school district, having enrolled there for the first time as a seventh grader. We observed that "the record strongly suggests that [the student] would never have even seen the Bibles, because the fifth grade is housed in a separate school facility than the seventh through the twelfth grades."[26]
 
 
 19
 BISD submits that, like the student plaintiff in Duncanville, the Does have not been exposed to the allegedly unconstitutional conduct and, based on random selection, may never be chosen to participate.[27] Furthermore, advances BISD, even if selected, the Doe children can simply decline to participate. BISD would thus have us conclude that the Does have no more than an abstract interest in seeing that lay persons are incorporated into the program: Their only exposure to the program thus far, contends BISD, is their awareness that once or twice each year, members of the clergy meet with other students in a different room located in a different part of the school. Accordingly, BISD asserts, the Does's injury, if any, does not rise above the type of attenuated psychological injury Valley Forge held insufficient to confer standing.
 
 
 20
 BISD's assertions widely miss the mark: The Does have alleged sufficient injury--more precisely, sufficient threatened injury--to establish their standing to challenge the Program. The threat of injury to the Does is readily distinguishable from that faced by the plaintiffs in Duncanville and Valley Forge. The record in Duncanville did not support standing because it showed that there was no reasonable chance that the plaintiff would be subjected to the challenged practice, which was confined to a different grade in a different building. By contrast, the Doe children attend schools in which the program operates, and they are continually at risk of being selected by BISD administrators, without advance notice and without parental consent. This difference is crucial.
 
 
 21
 Similarly, the undisputed material facts of the instant case are easily distinguishable from those in Valley Forge. In that case, the plaintiffs did not even live in the state in which the property at issue was located. The Does live in the school district in which the Program is maintained, and are compelled by law to attend some of the very BISD schools in which the Program is implemented. The Does are not simply claiming that the Constitution has been violated in some distant place, with personal injury predicated on having been aware of or having observed conduct with which they disagree. Quite to the contrary, the Does leave home every morning of the school year to attend schools in which the Program is ongoing. This Damoclean threat removes the Does's claim from the realm of generalized grievance and provides the degree of "concrete adverseness" necessary for the adjudication of constitutional issues.[28] And, the chances of one of the Doe children being selected are real, not merely the extremely remote odds of a lightening strike or a lottery win. This is precisely the kind of threat of personal and direct non-economic injury that is actionable under the Establishment Clause. That the Does have not actually been selected for counseling is immaterial. As we stated in Ingebretsen v. Jackson Public School District, "[t]here is no need ... to wait for ... actual violations of [plaintiffs'] rights under the First Amendment where the [Program] 'makes inappropriate government involvement in religious affairs inevitable.' "[29]
 
 
 22
 BISD's effort to ameliorate the standing situation by protesting that the children now can decline to participate in the Program--thereby arguably making participation "voluntary"--is specious at best. In Lee v. Weisman,[30] the Supreme Court addressed the challenge of a public school student and her father to the inclusion of invocations and benedictions in the form of prayer at public school graduation. After observing that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools,"[31] the Court explained that "[t]he undeniable fact is that the school district's supervision and control of a high school graduation ceremony places public pressure, as well as peer pressure, on attending students to stand as a group or, at least, maintain respectful silence during the invocation and benediction."[32] The Court concluded that a finding of no violation would "place objectors in the dilemma of participating, with all that implies, or protesting."[33] This is a position in which "the State may not, consistent with the Establishment Clause, place primary and secondary school children.... "[34]
 
 
 23
 A BISD student selected to participate in the Program is placed in precisely the same kind of "Catch-22" as the plaintiff in Lee--either attend clergy counseling that he and his parents find offensive or decline after being selected and thus be subjected to the one thing that virtually no school child can abide: being perceived by his teachers and his fellow students as "different." That potentiality undeniably creates pressure from both peers and authority to conform. We hold that the Does have "injured party" standing to challenge the Program.[35]
 
 C. Establishment Clause Violation
 
 24
 Although the district court held that the Does lack standing to bring this action, it nevertheless went on to address the merits of their claim, granting summary judgment to BISD. The district court assayed the Program by conducting the three-part test crafted by the Supreme Court in Lemon v. Kurtzman[36] to determine whether the Program violates the Establishment Clause. Under Lemon, a government practice is unconstitutional if: (1) it does not have a secular purpose; (2) its primary effect either advances or inhibits religion; or (3) it excessively entangles government with religion.[37] Applying the Lemon Test, the district court determined that:
 
 
 25
 1. The Program is "a secular program with appropriate goals and guidelines."
 
 
 26
 2. The Program has "a permissible secular purpose of teaching civic values and virtues."
 
 
 27
 3. The Program "neither advances nor inhibits religion."
 
 
 28
 4. The Program "has sufficient guidelines to ensure no excessive entanglement between church and state."
 
 
 29
 The court concluded that there was no genuine issue of material fact and that the Program does not violate the First Amendment as a matter of law. As noted, the district court did not address the Does's claim that the Program violates the Texas Constitution.[38]
 
 1. Legal Standards
 
 30
 We have identified three tests used by the Supreme Court to determine whether the Establishment Clause has been violated. The first of these is the one used by the district court, the three-pronged Lemon Test.[39] As the Lemon Test is disjunctive, a statute or policy that fails to satisfy any one of this test's three prongs must be struck as violative of the Establishment Clause.[40]
 
 
 31
 The second test, which the Court set forth in Lee, is the so-called "Coercion Test," under which school-sponsored religious activity is analyzed to determine the extent, if any, of its coercive effect on students.[41] Although it is conjunctive, this, too, is a tripartite test: "[U]nconstitutional coercion [occurs] when: (1) the government directs (2) a formal religious exercise (3) in such a way as to oblige the participation of objectors."[42]
 
 
 32
 The third test is known as the "Endorsement Test." It seeks to determine whether the government endorses religion by means of the challenged action.[43] The "[g]overnment unconstitutionally endorses religion whenever it appears to take a position on questions of religious belief, or makes adherence to a religion relevant in any way to a person's standing in the political community."[44] "The government creates this appearance when it conveys a message that religion is 'favored,' 'preferred,' or 'promoted' over other beliefs."[45] And, the instant case illustrates the well-recognized observation that, as the Establishment Clause refers to "religion" and not "a religion," government action need not favor nor disfavor a particular theology or denomination to violate the clause: Favoring religion over nonreligion or some other belief system is sufficient.[46]
 
 2. The Lemon Test
 
 33
 a. Secular Purpose
 
 
 34
 The Does argue that the program fails the first prong of Lemon, as BISD's purpose in designing, implementing, and administering the program is to endorse and advance religion among its public school students. They assert that BISD's proffered secular goals of providing a safe school atmosphere and volunteer opportunities for additional stakeholders are merely pretextual, pointing both to Dr. Thomas's statement that prayer is needed in schools[47] and to the "Reasons for a SchoolChurch Alliance" leaflet distributed to the clergy in introducing them to the program.[48] The Does additionally insist that the exclusive counseling arrangement afforded to the clergy, together with BISD's prompting of the clergy to use their prayers and churches to advance BISD's objectives, confirm its overarching religious purpose in maintaining the Program.
 
 
 35
 Predictably, BISD counters that the Program is secular in purpose, fostering the nonreligious goals of (1) instilling values and civic morals in students through open dialogue, and (2) exposing members of the clergy to the real world of today's students. BISD posits that neither Dr. Thomas's alleged prayer-in-schools comment nor the alliance leaflet concerned the Program; and, further, that BISD did not distribute the leaflet.
 
 
 36
 Courts are normally deferential to a government's articulation of secular purpose; and as BISD asserts, government may play an active role in teaching civic values, virtues, and the community's moral code, despite the fact that these values may overlap with religious beliefs.[49] Nevertheless, the government's statement of secular purpose must be "sincere and not a sham."[50]
 
 
 37
 Dr. Thomas's speech and the "Reasons for a School-Church Alliance" document--which, irrespective of its origin, BISD distributed to the clergy volunteers--constitute strong evidence that BISD's purpose in confecting, shepherding, and implementing the Program was to promote and endorse religion.[51] Indeed, the procedures permitting students who are selected for participation in counseling sessions to decline to do so implies that BISD itself viewed these exercises as religious in nature.[52] Nevertheless, in as much as we ultimately conclude that the Program fails both the second and the third prongs of the Lemon test, we need not determine whether the purpose for the Program articulated by BISD is in fact sincere and not a sham.
 
 
 38
 b. Primary Effect
 
 
 39
 Even assuming arguendo that the Program slips under the secular purpose rope of Lemon, however, it unmistakably has the primary effect of advancing religion in schools. "The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval."[53] This consideration is especially important in the context of public schoolchildren:[54]
 
 
 40
 The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools. Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary.[55]
 
 
 41
 Citing Agostini v. Felton,[56] BISD maintains that the Program's primary effect is the advancement of a religion-neutral, secular dialogue between clergymen and students which neither favors nor disfavors religion; BISD contends that the presence of non-clergy volunteers would not alter the Program's basic operation. We find these contentions feckless.
 
 
 42
 In Agostini, the Supreme Court held constitutional a federally-funded program that sent public school teachers into parochial schools to provide remedial education to disadvantaged children. In so doing, the Court recognized that it no longer presumes that public employees will inculcate religion simply because they are in a sectarian environment.[57] The Court concluded that, because the remedial education program allocated services based on religion-neutral criteria, it did not have the practical effect of advancing religion.[58]
 
 
 43
 Although the government program in Agostini involved the provision of government services to a religious organization, rather than the introduction of religious representatives into a governmental function as is the case here, the Court's approach in Agostini is still instructive.[59] Indeed, we conclude that the Program advances religion precisely because it lacks the neutrality that was key to the Court's determination in Agostini that remedial education program neither favored nor disfavored religion.
 
 
 44
 BISD's creation of a special program that recruits only clergymen to render volunteer counseling makes a clear statement that it favors religion over nonreligion, at least in the context of those deemed suitable to participate in student counseling on matters of morality and virtue. BISD fails to include lay professionals, who are arguably well qualified to mentor students in this regard. In short, notwithstanding BISD's asseveration to the contrary, BISD does not select its volunteer counselors based on neutral criteria--such as listening or communication skills--but rather on the very fact that they are religious representatives.[60] Indeed, the sole criterion for participation in the Program--ordination--is bestowed not by BISD but by whatever clerical body is empowered, on purely theological grounds, to confer one of the requisite titles: Reverend, Monsignor, Rabbi, Imam, or the like.
 
 
 45
 A governmental measure advances religion over irreligion when "it gives a preferential, exceptional benefit to religion that it does not extend to anything else."[61] This is precisely what BISD has done here. A student who is plucked from his or her classroom, escorted to another part of the school, and addressed by a homogenous group of adults on matters of morality and civic virtue, while two school administrators look on approvingly or join in the activity, will undoubtedly be impressed with the prestige and importance of those adults.[62] Under BISD's program, the only faces that the selected students will see at the head of the class will be those of the clergy volunteers. BISD cannot, consistent with the Establishment Clause, wield its power over its students to grant such preferential access to representatives of established religion. The conclusion is inescapable that the Program flunks the primary effect prong of the Lemon test.
 
 
 46
 c. Excessive Entanglement
 
 
 47
 The Program patently violates Lemon 's final prong as well. School officials are intimately and continuously involved in an overt and highly visible manner in designing and administering the Program. School officials (1) actively recruit members of the clergy; (2) provide ongoing clergy training; (3) disseminate counseling guidelines; (4) recommend selected topics--and proscribe other topics--for discussion during the counseling sessions; (5) assemble the clergy volunteers at local churches for briefings by BISD personnel and prayer in advance of counseling sessions; (6) allocate government property, facilities, personnel, and time to the program; (7) select the student participants; (8) actively monitor and facilitate the clergy/student dialogue at counseling sessions; (9) implore participating clergymen to use their prayer services and churches to advance the Program's objectives; and (10) through its attorney, render legal advice to the clergy.
 
 
 48
 This level of involvement far exceeds the entanglement that in Lee was held sufficient to be unconstitutional. In Lee, after noting that school officials (1) decided to include prayer as part of the graduation ceremonies, (2) selected the clergyman to give it, (3) provided guidelines, and (4) advised that the prayer should be non-sectarian, the Supreme Court concluded that "[t]he government involvement with religious activity ... [was] pervasive, to the point of creating a state-sponsored and state-directed religious exercise in a public school."[63] Here, BISD recruits clerics for a year-round program--not just a memorable, one-time event like graduation, justifying solemnity--and dedicates untold hours of direct participation by school personnel, making BISD's involvement considerably more pervasive and inextricably intertwined than the participation of the school administrators in Lee.[64] BISD thus garners a failing grade on the excessive entanglement prong of Lemon as well. Making F's on at least two of the three prongs under the Lemon test, when failure of only one of the three spells unconstitutionality, dispels any possible doubt.
 
 3. The Coercion Test
 
 49
 As stated above, a government practice has an unconstitutional coercive effect if "(1) the government directs (2) a formal religious exercise (3) in such a way as to oblige the participation of objectors."[65] BISD first insists that the Program does not rise to the level of a "formal religious exercise" and, second, that participants are not obliged to take part in the Program but are merely "invited."
 
 
 50
 We easily dispense with the latter contention. Under the Program, BISD administrators--officials with extensive actual and perceived power and authority over students' lives[66]--select students for immediate participation without notifying the their parents, much less obtaining parental consent. A selected student who does not wish to participate is placed in the untenable position of having to choose either to attend a session he truly wants to avoid or to decline the "invitation" and thereby risk actual or perceived opprobrium and ostracism from BISD administrators and faculty, not to mention from his peers. This affords the student no real choice, just a "Hobson's Choice"--either to participate in the Program against his wishes or decline at the risk of becoming a pariah. The Supreme Court made clear in Lee that under these circumstances participation is never "voluntary."[67]
 
 
 51
 Turning to the BISD's first contention, the Supreme Court has neither defined what constitutes a "formal religious exercise" nor furnished any detailed guidance as to how to make such a determination. This failure is not surprising, given that the unconstitutional practice in question in Lee was a graduation prayer delivered by a rabbi--an activity undeniably religious in nature. Here, the question is somewhat less pellucid. As an initial matter, the relevant inquiry is clearly not coextensive with the inquiry conducted under the first prong of Lemon--that is, we are not examining whether BISD had a religious purpose in designing the Program but whether its actual character is religious. Nowhere in Lee did the Supreme Court examine the school's motive for adopting the graduation prayer policy. The question of a program's purpose is logically distinct from the program's actual character.
 
 
 52
 Thus, our focus is on the Program's design, implementation, and effect, and not its purpose or goal. The Supreme Court's analyses in Lynch v. Donnelly and County of Allegheny v. American Civil Liberties Union are instructive. In Lynch, the Court held that a city's Christmas display, which included a creche, or nativity scene, did not run afoul the Establishment Clause.[68] In so concluding, the Court admonished that exclusive focus on the religious component of an activity would inevitably lead to invalidation under the Establishment Clause[69] and emphasized that the creche was but a "passive symbol"[70] and constituted only a single component of the larger, religion-neutral display.[71] In her concurrence, Justice O'Connor placed particular emphasis on this latter point, stating that both because the creche is "a traditional symbol" of Christmas, itself a holiday with strong secular elements, and because the creche was "displayed along with purely secular symbols," the overall arrangement "negates any message of endorsement" of "Christian beliefs represented by the creche."[72]
 
 
 53
 In Allegheny, the Court majority adopted the method of analysis employed by Justice O'Connor in her Lynch concurrence.[73] Allegheny also concerned the constitutionality of a creche displayed at Christmas time. In contrast to the creche in Lynch, however, the Allegheny nativity scene was the central element of the Christmas display, accompanied only by a fence, some poinsettias and some small trees.[74] The Court concluded that, because nothing in the display ameliorated the creche's religious message, the display constituted an endorsement of religion and therefore violated the Establishment Clause.[75] Also at issue in Allegheny was the constitutionality of a display featuring a Chanukah menorah, a 45-foot Christmas tree, and a sign saluting liberty. Employing the same contextual approach, the Court concluded that the this combination--particularly in light of the dominance of the 45-foot, secular Christmas tree--constituted a secular celebration of Christmas and thus did not offend the Establishment Clause.[76]
 
 
 54
 Although presented in a different context, the Court's analysis sheds considerable light on our present inquiry. When these two cases are read in pari materia, the central message that emerges from the Lynch-Allegheny dichotomy is that, to pass constitutional muster, the religious component of any governmental practice or policy cannot overwhelm the nonreligious portions. The Program fails this test resoundingly.
 
 
 55
 The clergy volunteers do not simply constitute a small part of a larger, nonreligious endeavor. They are, so to speak, the whole show. To paraphrase the Court in Allegheny, in the Program, the clergy "stand alone."[77] Neither is it insignificant that the nature of counseling the clergy volunteers provide is essentially identical to that which they provide in their strictly religious roles as spiritual leaders of their respective religious communities. Thus, although in a vacuum student counseling is not an inherently religious undertaking, when the practice under scrutiny consists of a group of counselors made up entirely of clergymen addressing a captive audience of primary and secondary public school students--at school, during school hours, under the aegis of school administrators--concerning morals and virtue, the exercise loses its secular character entirely. Accordingly, we conclude that, because the Program consists solely of members of the clergy engaged in conduct closely tracking prototypical pastoral endeavors and activities, it constitutes a formal religious exercise. And, as there is no dispute that BISD directed the Program, the Program fails the Coercion Test of constitutionality.
 
 4. The Endorsement Test
 
 56
 For its third and final strike, the Program proves to be unconstitutional under the Endorsement Test as well. The palpably ubiquitous involvement of BISD and its highest officials--superintendent, school principals, and counselors--conveys the unmistakable message that religion is favored, preferred, and even promoted, over other beliefs. By adopting a counseling program specifically designed for volunteer clergymen only,[78] then underscoring its exalted position by taking students out of academic classes at special times during the school day to participate in this project, these public school officials unmistakably endorse religion in a constitutionally impermissible way.[79] Theirs is a message of endorsement that cannot possibly be lost on the young, impressionable, easily influenced schoolchildren whom the law entrusts to these very officials, in loco parentis, for the entire school day.
 
 
 57
 Under each of the Supreme Court's tests, we find the Program to be antithetical to the Establishment Clause. We are therefore constrained to hold it unconstitutional both as confected and as conducted.
 
 D. The Dissent
 
 58
 We briefly address what we perceive to be mischaracterization of some of the facts and applicable law by Judge Garza's dissent, lest they go undetected. Rather than setting forth all of our disagreements with Judge Garza's version, we speak only to the most important errors. For example, Judge Garza makes the unequivocal statement that there is no evidence in the record that the students selected to participate in the Program know that the volunteers addressing them are members of the clergy. No party has made such an assertion and such a conclusion is clearly contrary to the record. Not only do the materials distributed to the clergy volunteers undeniably envision the clergy revealing their occupation (if not their particular religious affiliation) to the students,[80] counsel for BISD admitted in oral argument that the children knew the volunteers were members of the "Clergy in the School" Program.[81] Moreover, in testifying at the TRO hearing regarding the possible psychological and social pressure Program places on children who are not of the Christian faith or who decide not to participate, Rabbi Peter Hyman, a clergy participant in the Program, stated that students had indicated to him that the "Clergy in Schools" Program had made them feel uncomfortable--obviously based on their awareness that the volunteers were clergy members. Indeed, BISD's argument that the Program is constitutional rests, in part, on the fact that the school district gives the children to opportunity to decline to participate in the Program if they are not comfortable with the idea of meeting with a group of clergymen. In short, Judge Garza's assertion that there is no evidence that the children know that the occupation of the clergy volunteers misstates the record.
 
 
 59
 Second, Judge Garza implies that BISD's other volunteer programs are similar in nature to the "Clergy in Schools" Program. To the contrary, as BISD admitted in oral argument, the volunteers of only two of their other programs ever discuss issues of civic values with the students--a group of retired persons, which addresses issues of "making the right choices," and police officers participating in the national Drug Abuse Resistance Education, or DARE, program. The volunteers of BISD's other programs either discuss their particular profession or provide services such as tutoring. The Program is certainly not, as Judge Garza intimates, just one of a multitude of volunteer programs, in which members of the community engage the school children on issues of values and morality. The record leaves no doubt that the Program is unique.
 
 
 60
 Judge Garza's primary legal error is his assertion that the Program's constitutionality is somehow affected by the makeup or mere existence of other volunteer programs. Judge Garza essentially asserts that, because BISD has invited several nonreligious groups to volunteer at its schools, it has remained neutral as between religion and non-religion and thus is permitted to invite a group composed solely of clergy to address school children plucked from their classrooms. He purports to buttress this argument with citations to cases (1) upholding the constitutionality of programs that involve the neutral provision of governmental services that only incidentally benefit sectarian institutions ("Neutral Provision Cases")[82] and (2) holding that the government cannot discriminate against religiously-affiliated groups when the government has created a public forum by granting the public, or some neutrally-defined subset thereof, "general access"[83] to, or "indiscriminate use"[84] of, government-controlled property ("Public Forum Cases").[85]
 
 
 61
 Judge Garza's argument suffers from two fatal flaws. First, the cases on which he relies are inapposite--at least to the proposition for which Judge Garza cites them. The underlying principle of both sets of cases is that, when the government provides a neutrally-defined benefit to the community in general or to some subset of the community--either by distributing a service, disbursing funds, or establishing a public forum--it cannot exclude religious organizations merely because of their religious affiliation. To do so would violate the Free Exercise Clause. BISD, however, is not providing a neutrally-defined benefit to the community by bringing volunteers into address school children. In other words, BISD is not providing something to the community but rather is introducing representatives of the community into public school context,[86] an issue that requires a different perspective than the cases on which Judge Garza relies.
 
 
 62
 Second, Judge Garza's insistence on analyzing the "Clergy in School" Program with reference to BISD's other volunteer programs is unavailing for the very simple reason that the individual school children who are removed from their classes as part of the Program are addressed not by a broad cross-section of BISD's volunteers, but rather by a handful of clergymen. To accept the argument that the other volunteer programs somehow rescue the Program from unconstitutionality would be to endorse the proposition that the government could introduce religious activities into public school as long as it also separately introduced nonreligious activities of a broadly similar nature into the public school as well. Put in more concrete terms, if we were to accept Judge Garza's argument, the Supreme Court's holding in Lee v. Weisman that the school district was not permitted to have a rabbi deliver a prayer at a high school graduation ceremony would have to fall because the school district also invited a speaker not affiliated with a religious organization to deliver the main graduation address. Such a result clearly is not required.[87] Because, under the Program, the group of volunteers that address the children are clergy and clergy alone, the Program's constitutionality must rise and fall without reference to BISD's other volunteer programs.
 
 
 63
 We further take issue with Judge Garza's remarkable assertion that neither the Doe children nor BISD students generally faces any psychological pressure to participate in the Program. Judge Garza concludes that, because they purportedly face no such pressure, the Does do not have private litigant standing to bring this suit[88] and the Program does not unconstitutionally coerce student participation in a religious exercise. After setting forth the role of psychological pressure in the Supreme Court's Establishment Clause jurisprudence, Judge Garza essentially asserts that, because the BISD students who wish to decline to participate in the Program would "assume no special burden" and would not be required to follow "a routine different than the majority of the students," they do not face the type of psychological pressure sufficient to constitute coercion under the relevant Supreme Court precedent.
 
 
 64
 Judge Garza's account of the relevant precedent is flawless. His conclusion, however, is a non sequitur. As the following passage from Schempp indicates (and which Judge Garza quotes in his dissent), a governmental policy unconstitutionally coerces students if it requires them to signal in front of their instructors and their peers that they do want to participate in a religious activity:[B]y requiring what is tantamount in the eyes of teachers and schoolmates to a profession of disbelief, or at least of nonconformity, the [excusal] procedure may well deter those children who do not wish to participate for any reason based upon the dictates of conscience from exercising an indisputably constitutional right to be excused.... [E]ven devout children may well avoid claiming their right and simply continue to participate in exercises distasteful to them because of an understandable reluctance to be stigmatized as atheists or nonconformists simply on the basis of their request.[89]
 
 
 65
 A BISD student, if he does not wish to participate in the Program, must so state in a classroom, where he is required to be present by State law, and which is filled with his peers, his teacher, and the school official who has arrived without warning to shepherd him to the room full of clergy members. The Program certainly places that student in a more difficult position than the students in Lee, who could avoid the rabbi's graduation prayer speech by simply not attending the non-mandatory graduation ceremony. Judge Garza's assertion otherwise is without foundation.
 
 
 66
 Finally, only a very brief response is required to Judge Garza's specious assertion that the majority opinion would prohibit individual members of the clergy, such as the late Reverend Martin Luther King, Jr. or Archbishop Desmond Tutu, from meeting with public school children to talk about civic virtues and, therefore, places BISD in a constitutionally untenable position of requiring it to discriminate against the clergy. Our opinion simply does no such thing. Rather, it holds that BISD cannot design and implement a volunteer counseling program consisting solely of clergy members. The opinion in no way affects BISD's ability to create a broad-based program that truly integrates the clergy with nonreligious community representatives and certainly does not mandate that BISD discriminate against the clergy or bar a high-profile public figure from advising the student body simply because such figure happens to be a cleric: Civil rights leaders like King and Tutu speaking as civil rights leaders do not lose their eligibility to speak publicly by virtue of their ordination.
 
 III
 CONCLUSION
 
 67
 Although there are some discrete facts in "genuine" dispute, they are not material, particularly in light of the plethora of material facts about the Program that are not in dispute--at least not genuinely. Indeed, BISD confirmed this when it filed its motion for summary judgment, the essence of which is the moving party's representation to the court that there are no genuine factual matters in dispute and that the case is ripe for disposition on legal issues alone. For the reasons set forth above, we hold that (1) the Does have legal standing to contest the constitutionality of the Program, and (2) the program is unconstitutional because it violates the Establishment Clause of the First Amendment of the United States Constitution. We therefore reverse the district court's ruling on standing and its grant of BISD's motion for summary judgment, and we remand this case to the district for entry of a judgment (1) invalidating the Program and prohibiting its further implementation, (2) awarding costs and reasonable attorneys' fees to the Does, as prevailing parties, and (3) conducting any additional proceedings and entering any additional orders, consistent herewith, as may be necessary or desirable.
 
 
 68
 REVERSED and REMANDED with instructions.
 
 EMILIO M. GARZA, Circuit Judge, dissenting:
 
 69
 "[I]t is an essential part of adjudication to draw distinctions, including fine ones, in the process of interpreting the Constitution." Walz v. Tax Comm'n, 397 U.S. 664, 679, 90 S.Ct. 1409, 1416, 25 L.Ed.2d 697 (1970). The present Establishment Clause controversy serves as a reminder of this responsibility. Unlike prior cases, it involves neither religious exercises in public schools, see, e.g., Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), the teaching or display of religious subject matter in public schools, see, e.g., Edwards v. Aguillard, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), a "released time" program to accommodate religious instruction of public school students, see Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), religious displays that the government either sponsors or allows on public property, see County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), delegation of government power to religious organizations, see Larkin v. Grendel's Den, Inc., 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982), a government policy or program that benefits religion, see, e.g., Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Board of Educ. v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), the government's refusal to provide a benefit to religious groups, see, e.g., Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), nor a requirement that a person attest to a particular religious belief to hold public office, see Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961). It concerns a public school program affording students and clergy the opportunity to discuss civic values. Instead of responding to this unique situation with a meticulous assessment of how each aspect of the program mirrors or differs from the government policies and practices at issue in earlier cases, the majority fixates on a few pieces of evidence and disregards critical parts of the summary judgment record. This incomplete analysis precipitates a decision contrary to Establishment Clause jurisprudence. I therefore dissent.
 
 
 70
 * Dr. Carrol A. Thomas, Jr., the superintendent of the Beaumont Independent School District ("BISD" or "school district"), announced the "Clergy in Schools" program ("CIS" or "Program") before the start of the 1996-97 school year. He planned for members of the local clergy to visit every secondary school at least twice a year and every elementary school at least once a year during school hours to discuss civic values with a group of 25 to 35 students.[1] He envisaged the clergy using their exceptional listening and communication skills to "have students open up to them and convince ... [students] that there is a better way to conduct themselves."
 
 
 71
 CIS was one of many BISD volunteer programs. For each program, the school district recruited only members of a particular constituency as volunteers,[2] gave each student asked to participate the option of declining to do so, and required the attendance of a school official during meetings between students and volunteers to insure that no problems arose.
 
 
 72
 Dr. Thomas invited members of the local clergy to an orientation session on CIS at BISD's administration building. During this event, he described the Program's philosophy. Participants brainstormed about CIS's strengths, identified problems facing youth, defined their expectations for CIS, reviewed the agenda for a typical school visit, explored the topics that students had proposed for discussion, and talked about how to avoid a church-state conflict.
 
 
 73
 Clergy members wanting to join the Program later attended a one-hour training session held at a local church. Dr. Thomas went over a list of "Do's" and "Don'ts." The "Don'ts" included prohibitions against "wear[ing] clothing which would advertise your church," "talk[ing] about when your church services meet," and "offer[ing] to pray with a student." Everyone agreed that volunteers would decline requests from students to pray.
 
 
 74
 Besides the admonitions given at the training session, other safeguards were implemented to protect against CIS touching on religious matters. Volunteers refrained from mentioning their religious affiliations to students. After receiving a letter from the attorney of a concerned parent,[3] Dr. Thomas instructed volunteers not to discuss topics "such as; [sic] abortion, sex education, etc." He also told them that a flyer entitled "Reasons for a School-Church Alliance" that was distributed at the training session "had been furnished to school district officials by a well-meaning PTA president" and that "the information in [it] ... was not intended to be used ... in ... discussions with students."[4]
 
 
 75
 The school district distributed a "Fact Sheet" that emphasized CIS's non-religious focus after a volunteer quoted the Bible during one of the first sessions with students. The "Fact Sheet" declared that the Program sought to provide "a positive forum which contributes to open dialogue of students discussing concerns and problems of the 21st century," to create a meaningful dialogue between clergy and students, to make schools safer, and to give the clergy a volunteer opportunity. It included the following set of expectations for volunteers: be a positive role model for students; show concern for students' success; provide academic support for students; be aware of what is happening in the schools; provide a safe and secure atmosphere for students; provide a positive means for obtaining desired student behavior; and help students gain an understanding of the real world. It listed alcohol, diversity, divorce, dress code, drugs, gossip, harassment, jealousy, peer pressure, racial issues, self-discipline, self-esteem, setting goals, stereotyping, respect, the reasons for rules, unity, and violence as possible discussion topics suggested by students.
 
 
 76
 The "Fact Sheet" stressed that CIS did not concern religious issues. In explaining the Program's rationale, it stated:
 
 
 77
 Noting the current issues students are presently facing, BISD wanted to provide opportunities for students to dialogue with skilled resources in the community. Because the Clergy has the natural skills of listening and communicating, BISD chose to tap this resource which has been previously not used to its fullest. In an effort to respect the separation of church and state, the Clergy in Schools program was reviewed by the school attorney. This is a program designed to provide volunteer opportunities for Clergy and is not a religious program.
 
 
 78
 In setting out the Program guidelines, the "Fact Sheet" stated that "[t]here will be no discussion of religion during the dialogue." It also reiterated the "Do's" and "Don'ts" reviewed at the training session, and added, "Don't discuss religion or quote passages from any religious material."
 
 
 79
 Despite the school district's effort to insure that CIS respected the Establishment Clause, a number of circumstances led some people to conclude that the Program was intended to provide clergy with a forum in which to proselytize students. At a luncheon held at a local church shortly after his hiring as superintendent, Dr. Thomas expressed a desire for prayer to return to the schools.[5] The school district neither contacted parents directly about the creation of CIS[6] nor required parental consent for a student to partake in a CIS session.[7] BISD officials distributed the "Reasons for a School-Church Alliance" flyer at the training session. During the same meeting, Dr. Thomas asked volunteers to preach about alcohol and drug abuse during upcoming worship services. Dr. Thomas also did not reply to communications from some parents and the Houston office of the Anti-Defamation League ("ADL") expressing concern about the constitutionality of CIS.[8] Finally, he had the school district's attorney meet with volunteers to explain why the Program was constitutional.
 
 
 80
 The plaintiffs, all of whom are students enrolled in Beaumont public schools, sued BISD, seeking declaratory and injunctive relief.[9] They alleged that the Program violated the Establishment Clause,[10] as well as Article I, § 6, of the Texas Constitution.
 
 
 81
 The plaintiffs filed a motion for a temporary restraining order ("TRO") to prevent CIS from continuing. BISD officials, several members of the local clergy, and the parent of one of the plaintiffs testified during an evidentiary hearing on the motion. The plaintiffs emphasized that they "did not have any ... hostility or antagonism to clergy members being volunteers in public schools." They stated that their concern arose from the fact that only clergy members could volunteer for CIS.[11] This situation, in their opinion, offended the Establishment Clause because it created the impression that BISD was endorsing religion over non-religion. The plaintiffs posited that the addition of persons from non-religious walks-of-life would remove any inkling of favoritism. The district court denied the motion for a TRO.[12]
 
 
 82
 The plaintiffs and BISD submitted cross-motions for summary judgment. Included among the plaintiffs' summary judgment materials was a letter Dr. Thomas had sent to the clergy after the commencement of litigation that asked them to help in preparing students for the Texas Assessment of Academic Skills test ("TAAS") and evidence disclosing that the school district's attorney had briefed school officials and volunteers on the litigation.
 
 
 83
 The district court granted summary judgment to BISD. It held that the plaintiffs lacked standing because they had suffered no injury in fact. This determination rested on numerous factual findings, including that the plaintiffs "ha[d] not been selected to participate in the program" and that "[s]tudent participation in the program is voluntary." The district court alternatively held CIS in compliance with the Establishment Clause, concluding that the Program "is a secular program with appropriate goals and guidelines," "has a permissible secular purpose of teaching civic values and virtues," "neither advances nor inhibits religion," and "has sufficient guidelines to ensure no excessive entanglement between church and state." The plaintiffs timely appealed.[13]
 
 II
 
 84
 We review a grant of summary judgment de novo. See United States v. Johnson, 160 F.3d 1061, 1063 (5th Cir.1998). Summary judgment occurs when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). Substantive law identifies the facts that are material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211-12 (1986). A dispute over a material fact is genuine only if the evidence in the summary judgment record suffices for a reasonable fact-finder to return a verdict in favor of the nonmoving party. See id. The inquiry at the summary judgment stage of litigation therefore centers on whether the evidence presents a sufficient disagreement to require submission to the fact-finder or whether it is so one-sided that the moving party must prevail as a matter of law. See id. at 251-52, 106 S.Ct. at 2512, 91 L.Ed.2d at 213-14.
 
 
 85
 The actual operation of the summary judgment standard depends on which party bears the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986). In this case, the plaintiffs bear the burden of proof on both standing and their Establishment Clause claim. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136-37, 119 L.Ed.2d 351, 363-65 (1992) (standing case); Adickes v. S.H. Kress & Co., 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142, 150 (1970) (§ 1983 case). Therefore, to carry its summary judgment burden, BISD--as the moving party--either must affirmatively offer evidence that undermines one or more of the essential elements of the plaintiffs' case, or must demonstrate that the evidence in the summary judgment record falls short of establishing an essential element of the plaintiffs' case. See International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264 (5th Cir.1991). If it does so, then the plaintiffs--as the nonmoving parties--must point to evidence sufficient for a reasonable fact-finder to decide in their favor. See id. A scintilla of evidence is not enough to carry this burden. See Anderson, 477 U.S. at 252, 106 S.Ct. at 2512, 91 L.Ed.2d at 214. Nor are conclusory allegations, speculation, and unsubstantiated assertions. See Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1429 (5th Cir.1996) (en banc).
 
 
 86
 We only consider the evidentiary record before the district court in reviewing a summary judgment ruling. See Topalian v. Ehrman, 954 F.2d 1125, 1131-32 n. 10 (5th Cir.1992). We draw all reasonable inferences from the evidence in favor of the nonmoving party, but refrain from weighing the evidence or resolving credibility questions. See Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 468-69, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265, 284-85 (1992); Anderson, 477 U.S. at 249, 106 S.Ct. at 2511, 91 L.Ed.2d at 212.
 
 III
 
 87
 "Article III of the Constitution limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies.' " Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700, 708-09 (1982). The doctrine of standing puts this restriction in concrete terms. See Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 354 (1975). To prove standing, the party asserting federal jurisdiction must show that: (1) he personally has suffered some actual or threatened injury (i.e., an injury in fact); (2) a causal connection exists between the injury and the conduct at issue; and (3) it is likely that the injury will be redressed by a favorable decision. See Lujan, 504 U.S. at 560-61, 112 S.Ct. at 2136, 119 L.Ed.2d at 363-65; Valley Forge, 454 U.S. at 472, 102 S.Ct. at 758, 70 L.Ed.2d at 709.
 
 
 88
 BISD maintains that the plaintiffs do not have standing because they have suffered no injury in fact. In support, it points to the voluntariness of student participation in CIS, the plaintiffs' lack of involvement in CIS, and the absence of evidence showing that the plaintiffs are taxpayers. The majority rejects this contention, finding that the plaintiffs face a real threat of injury because psychological pressure from their peers and school authorities will induce them to accept an offer to become involved in the Program.[14]
 
 
 89
 Unlike the majority, I find the school district's contention persuasive. A student suffers an injury in fact when he is "subjected to unwelcome religious exercises or ... forced to assume special burdens to avoid them." Valley Forge, 454 U.S. at 486 n. 22, 102 S.Ct. at 766 n. 22, 70 L.Ed.2d at 718 n. 22. Neither one of these circumstances arises here. The evidence nowhere discloses that the plaintiffs have attended a CIS session. Cf. Murray v. City of Austin, Tex., 947 F.2d 147, 150, 151-52 (5th Cir.1991) (finding standing where the plaintiff had personal contact with an objectionable religious symbol). It also is insufficient for a reasonable fact-finder to conclude that psychological pressure will induce the plaintiffs to participate if asked to do so.[15] Nor does the evidence show that the plaintiffs must assume a special burden if they decline to join; that is, nothing in the summary judgment record indicates that those students who opt out must follow a routine different from that of the majority of students. See Lee v. Weisman, 505 U.S. 577, 584, 594-96, 112 S.Ct. 2649, 2654, 2659-60, 120 L.Ed.2d 467, 478-79, 485-87 (1992) (finding dissenter to possess standing where she was faced with the prospect of either not attending her high school graduation or excusing herself from part of it to avert participating in prayers); School Dist. v. Schempp, 374 U.S. 203, 205-08, 211-12 & n. 9, 83 S.Ct. 1560, 1562-64, 1565-66 & n. 9, 10 L.Ed.2d 844, 848-50, 851-52 & n. 9 (1963) (finding dissenters to possess standing where they were excused from participating with other students in a daily Bible reading that was made either over the intercom system, in the classroom, or during opening exercises).
 
 
 90
 I also agree with BISD that the plaintiffs have failed to adduce any evidence demonstrating that they have suffered injury as taxpayers. To establish standing as a state or municipal taxpayer, a party must show that (1) he pays taxes to the relevant government entity, and (2) the expenditure of tax revenues on the government policy or practice to which he objects. See Doe v. Duncanville Indep. Sch. Dist., 70 F.3d 402, 408 (5th Cir.1995). The plaintiffs fail to satisfy this standard's first element. None of the evidence indicates that they pay taxes that go to BISD.[16] See Doremus v. Board of Educ.of Borough of Hawthorne, 342 U.S. 429, 435, 72 S.Ct. 394, 397-98, 96 L.Ed. 475, 480 (1952) (stating that taxpayer standing turns on the "possession of the requisite financial interest that is, or is threatened to be, injured by unconstitutional conduct"); Freedom From Religion Found., Inc. v. Zielke, 845 F.2d 1463, 1470 (7th Cir.1988) (finding that the plaintiff did not have taxpayer standing because she failed to allege or prove that she was a municipal taxpayer); Protestants & Other Ams. United for Separation of Church & State v. Watson, 407 F.2d 1264, 1265-66 (D.C.Cir.1968) (directing the district court to dismiss for lack of taxpayer standing "[i]f [the plaintiff] ... is not a taxpayer").
 
 
 91
 The district court correctly held that the plaintiffs lack standing. This circumstance should bring our review of this appeal to an end. The majority, however, decides that the district court erred in finding no standing, and proceeds to rule on the merits. This disposition results in serious harm to our Establishment Clause jurisprudence.
 
 IV
 
 92
 The Establishment Clause, a part of the First Amendment to the United States Constitution, provides: "Congress shall make no law respecting an establishment of religion...."[17] U.S. CONST. amend. I. This prohibition seeks to guarantee that the government is neutral toward religion. See Everson v. Board of Educ. of Ewing Tp., 330 U.S. 1, 15, 18, 67 S.Ct. 504, 511, 513 91 L.Ed. 711, 723 (1947) ("Neither [a state nor the federal government] can pass laws which aid one religion, aid all religions, or prefer one religion over the other.") ("[The Establishment Clause] ... requires the state to be neutral in its relations with groups of religious believers and non-believers...."). However, it does not absolutely bar the public and religious spheres from interacting. See Zorach, 343 U.S. at 312, 72 S.Ct. at 683, 96 L.Ed. at 961 ("The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State.").
 
 
 93
 The qualified nature of the Establishment Clause explains the Supreme Court's struggle over the years to formulate a standard for reviewing claims alleging a violation of the Establishment Clause. In 1971, the Court, looking to the factors that had influenced its prior decisions, announced the following three-part test ("the Lemon test") to gauge the permissibility of a government policy or practice under the Establishment Clause: (1) the policy or practice must have a secular purpose; (2) its principal or primary effect must be one that neither advances nor inhibits religion; and (3) it must not foster an excessive government entanglement with religion. See Lemon, 403 U.S. at 612-13, 91 S.Ct. at 2111, 29 L.Ed.2d at 755-56.
 
 
 94
 Dissatisfaction with the Lemon test has led several Justices to advocate alternative analytical frameworks. Justice O'Connor has introduced the endorsement test. See Lynch, 465 U.S. at 688-94, 104 S.Ct. at 1366-70, 79 L.Ed.2d at 619-24 (1984) (O'Connor, J., concurring). Under the endorsement test, "Lemon's inquiry as to the purpose and effect of a [government policy or practice] ... requires courts to examine whether government's purpose is to endorse religion and whether the [policy or practice] ... actually conveys a message of endorsement."[18] Wallace v. Jaffree, 472 U.S. 38, 69, 105 S.Ct. 2479, 2496, 86 L.Ed.2d 29, 51-52 (1985) (O'Connor, J., concurring in the judgment).
 
 
 95
 Justice Kennedy also has promoted a different approach, known as the coercion test. See Lee, 505 U.S. at 587, 112 S.Ct. at 2655, 120 L.Ed.2d at 480-81. His standard focuses on whether or not a government policy or practice concerning religion forces an individual to support or to participate in any religion or its exercise. See Allegheny, 492 U.S. at 659-63, 109 S.Ct. at 3136-38, 106 L.Ed.2d at 537-40 (Kennedy, J., concurring in the judgment in part and dissenting in part).
 
 
 96
 Although the Lemon test endures, Justices O'Connor and Kennedy have attracted support for their respective alternatives.[19] See Jones v. Clear Creek Indep. Sch. Dist., 977 F.2d 963, 966 (5th Cir.1992). We consequently resort to the Lemon, endorsement and coercion tests when reviewing an Establishment Clause case. See Ingebretsen v. Jackson Pub. Sch. Dist., 88 F.3d 274, 278-79 (5th Cir.1996).
 
 V
 
 97
 The first prong of the Lemon test requires a government policy or practice to have a secular purpose. See Lemon, 403 U.S. at 612, 91 S.Ct. at 2111, 29 L.Ed.2d 745. Only legislation or state action "motivated wholly by religious considerations" contravenes this demand.[20] Lynch, 465 U.S. at 680, 104 S.Ct. at 1362-63, 79 L.Ed.2d at 614-15. Before finding compliance with the first prong, we must assure ourselves that the government's stated secular purpose is sincere, not a sham. See Edwards, 482 U.S. at 586-87, 107 S.Ct. at 2579, 96 L.Ed.2d at 520-22. We examine the legislative text, the legislative history, and the interpretation of the legislation by the responsible administrative agency to determine if a secular purpose is sincere. See id. at 594, 107 S.Ct. at 2583, 96 L.Ed.2d at 525-26.
 
 
 98
 The majority refrains from deciding whether or not CIS satisfies the Lemon test's purpose prong. However, it still observes that the following "constitutes strong evidence" of a religious intent: (1) Dr. Thomas' remark in support of school prayer; (2) BISD's provision of the "Reasons for a School-Church Alliance" flyer to volunteers; and (3) BISD's practice of allowing students to decline invitations to meet with volunteers.[21]
 
 
 99
 I find the evidence insufficient to create a fact issue on BISD's purpose in establishing the Program. The summary judgment record discloses an intention to achieve numerous secular purposes.[22] Dr. Thomas admittedly did state a desire for the return of school prayer shortly after he was named BISD's superintendent. However, the subsequent implementation of CIS shows an unwavering commitment to a secular focus. Both the orientation and training sessions included segments on the need to keep discussions with students free of religious matters. Upon learning that the Bible was quoted during one of the first CIS sessions, BISD issued the "Fact Sheet," which not only listed all of the Program's secular goals, but also stressed its non-religious character. Similarly, Dr. Thomas directed volunteers to refrain from talking about topics implicating religious beliefs, and disavowed the "Reasons for a School-Church Alliance" flyer after a parent expressed concern about these matters.
 
 
 100
 The evidence, taken in its entirety, is so one-sided that a reasonable fact-finder can only decide that the motives for CIS were not wholly religious. Dr. Thomas' endorsement of prayer in school and the distribution of the "Reasons for a School-Church Alliance" flyer are legally insufficient to prove an exclusively sectarian purpose. Nor does BISD's practice of permitting students to forego participation in the Program carry the plaintiffs' summary judgment burden. As this feature is common to all BISD volunteer programs, a reasonable fact-finder cannot infer a wholly religious motivation from it. The district court therefore did not err in concluding that CIS "is a secular program with appropriate goals and guidelines" and "has a permissible secular purpose of teaching civic values and virtues."
 
 VI
 
 101
 The second prong of the Lemon test mandates that the primary effect of a government policy or practice be one that neither advances nor inhibits religion. See Lemon, 403 U.S. at 612, 91 S.Ct. at 2111, 29 L.Ed.2d at 755. Its concern is whether or not legislation or state action has the direct or immediate effect of promoting religion. See Committee for Pub. Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 783 n. 39, 93 S.Ct. 2955, 2971 n. 39, 37 L.Ed.2d 948, 969 n. 39 (1973). We do not find an Establishment Clause violation when religion only benefits indirectly or incidentally. See id. at 775, 93 S.Ct. at 2967, 37 L.Ed.2d at 964.
 
 
 102
 The majority determines that CIS "flunks the primary effect prong" because the Program is not "an indistinguishable part of a larger effort, but rather ... a ... clearly distinct and identifiable program." The summary judgment record belies this holding. CIS represents one of numerous volunteer programs that BISD has created. Each volunteer program gives a certain constituency an opportunity to provide students with the benefit of the particular expertise of its members. Inviting the clergy to contribute to this broad-based effort provides no more than an indirect or incidental benefit to religion.[23] See Widmar v. Vincent, 454 U.S. 263, 274, 102 S.Ct. 269, 277, 70 L.Ed.2d 440, 450 (1981) ("The provision of benefits to so broad a spectrum of groups is an important index of secular effect."); Roemer v. Board of Pub. Works, 426 U.S. 736, 746-47, 96 S.Ct. 2337, 2344-45, 49 L.Ed.2d 179, 187-88 (1976) ( "[R]eligious institutions need not be quarantined from public benefits that are neutrally available to all.... [Our prior decisions have] put to rest any argument that the State may never act in such a way that has the incidental effect of facilitating religious activity."). The district court therefore correctly concluded that CIS "neither inhibits nor advances religion."
 
 VII
 
 103
 In addressing the effect prong of the Lemon test and responding to this dissent, the majority holds that the exclusive use of clergy to lead discussions with students on civic virtue is a fatal defect of CIS. In doing so, it implicitly embraces the position that the Establishment Clause forbids the "use [of] essentially religious means to serve governmental ends where secular means would suffice."[24] Schempp, 374 U.S. at 294-95, 83 S.Ct. at 1609-10, 10 L.Ed.2d at 899-900 (Brennan, J., concurring); see also Karen B. v. Treen, 653 F.2d 897, 901 (5th Cir. Unit A Aug.1981) ("the state cannot employ a religious means to serve otherwise legitimate secular interests"), aff'd, 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982) (mem.).[25]
 
 
 104
 The religious-means-secular-ends test underlying the majority's discussion is no longer viable. See Gonzales v. North Township, 4 F.3d 1412, 1423 n. 11 (7th Cir.1993). Although the Court applied the test (without citation to authority) in Larkin v. Grendel's Den, Inc., 459 U.S. 116, 123-24, 103 S.Ct. 505, 510-11, 74 L.Ed.2d 297, 304-05 (1982), it subsequently declined to do so in Lynch v. Donnelly, 465 U.S. 668, 681 n. 7, 104 S.Ct. 1355, 1363 n. 7, 79 L.Ed.2d 604, 615 n. 7 (1984). Justice Blackmun tried to resuscitate the test in County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 618, 109 S.Ct. 3086, 3114, 106 L.Ed.2d 472, 510 (1989) (Blackmun, J.), but a majority of the Court opposed him.[26] Justice O'Connor called the test "too blunt an instrument for Establishment Clause analysis, which depends on sensitivity to context and circumstances presented by each case." Id. at 636-37, 109 S.Ct. 3086, 3124, 106 L.Ed.2d at 522-23 (O'Connor, J., concurring in part and concurring in the judgment). Justice Kennedy, joined by Chief Justice Rehnquist, and Justices White and Scalia, also objected. See id. at 676-77, 109 S.Ct. at 3145, 106 L.Ed.2d at 548-49 (Kennedy, J., concurring in the judgment in part and dissenting in part). In passing, he noted that "a majority of the Court today rejects Justice BLACKMUN's approach...." Id. at 676 n. 12, 109 S.Ct. at 3145 n. 12, 106 L.Ed.2d at 549 n. 12 (Kennedy, J., concurring in the judgment in part and dissenting in part). Lynch and Allegheny therefore marked the death-knell for the religious means-secular ends test.
 
 
 105
 Even if the religious-means-secular-ends test is applicable, the majority still errs. Agreeing with the plaintiffs, it views BISD's exclusive reliance on the clergy to lead discussions with students on civic values as analogous to using the Bible or a prayer to further a secular goal such as promoting morality or enhancing awareness of the spiritual dimensions of human nature. See Schempp, 374 U.S. at 223-24, 83 S.Ct. at 1572, 10 L.Ed.2d at 858-59; Karen B., 653 F.2d at 899-901. Beneath this perception lies the assumption that the clergy are incapable of expounding on civic values from anything but a religious perspective.
 
 
 106
 I reject the majority's position. That civic values bear a close relationship to certain religious beliefs proves neither that CIS lacks a secular purpose nor that its primary effect is the advancement of religion. BISD may advocate civic values that "merely happen[ ] to coincide or harmonize with the tenets of some or all religions."[27] McGowan, 366 U.S. at 442, 81 S.Ct. at 1113, 6 L.Ed.2d at 408-09; see also Brown v. Woodland Jt. Unified Sch. Dist., 27 F.3d 1373, 1380-81 (9th Cir.1994) (discussing cases). Moreover, relying solely on the clergy to lead discussions on civic values by itself does not transmute the Program into a religious activity. See Bowen v. Kendrick, 487 U.S. 589, 613, 108 S.Ct. 2562, 2576, 101 L.Ed.2d 520, 543 (1988); cf. Agostini v. Felton, 521 U.S. 203, 234, 117 S.Ct. 1997, 2016, 138 L.Ed.2d 391, 421 (1997) ("we no longer presume that public employees will inculcate religion simply because they happen to be in a sectarian environment"). "It long has been established ... that the State may send a cleric, indeed even a clerical order, to perform a wholly secular task." Roemer, 426 U.S. at 746, 96 S.Ct. at 2344, 49 L.Ed.2d at 187-88. Finally, the volunteers do not patently evince religiousness. They refrain from revealing their religious affiliation to students, and the summary judgment record does not include evidence suggesting that students possess independent knowledge of the religious backgrounds of the volunteers. Given these circumstances, no basis exists for finding that the clergy serve as a religious means to achieve secular ends.
 
 
 107
 The majority wrongly holds that the exclusive use of clergy renders the Program in violation of the Establishment Clause. Indeed, under its rationale, luminaries such as the late Reverend Martin Luther King, Jr., and Archbishop Desmond Tutu could not meet individually with students to talk about civic values. The Establishment Clause does not mandate such an absurd result.
 
 VIII
 
 108
 The Lemon test's final prong directs the government to avoid excessive entanglement with religion. See Lemon, 403 U.S. at 612-13, 91 S.Ct. at 2111, 29 L.Ed.2d at 755-56. The degree of entanglement between the public and religious sectors varies with the degree to which the government policy or practice impacts religion. See Agostini, 521 U.S. at 230-34, 117 S.Ct. at 2014-15, 138 L.Ed.2d at 418-21. Despite this correlation, the final prong focuses on distinct issues. It considers the administrative consequence of a relationship between the government and religion--that is, the extent to which public and religious organizations find themselves involved in each other's affairs as a result of a government policy or practice.[28] See Lemon, 403 U.S. at 615, 91 S.Ct. at 2112, 29 L.Ed.2d at 757. Excessive entanglement also contemplates the potential for legislation or state action to foment political division along religious lines. See id. at 403 U.S. at 622-23, 91 S.Ct. at 2115-16, 29 L.Ed.2d at 761-62. This second issue becomes germane when the government directly subsidizes religious institutions. See Lynch, 465 U.S. at 684, 104 S.Ct. at 1365, 79 L.Ed.2d at 616-17. Rancor surrounding litigation involving an Establishment Clause claim cannot evince political divisiveness.[29] See id. at 684-85, 104 S.Ct. at 1365, 79 L.Ed.2d at 616-18.
 
 
 109
 The majority holds that CIS "patently violates" the Lemon test's final prong because BISD officials "are intimately and continuously involved in an overt and highly visible manner in designing and administering the Program." Once again, the summary judgment record refutes the majority's determination.
 
 
 110
 The majority bases its decision in part on immaterial evidence. Dr. Thomas admittedly asked the clergy to preach about alcohol and illegal drugs and to help students prepare for TAAS. However, neither request evinces a problematic commingling of church and state, for he left the decisions to preach about alcohol and illegal drugs and to provide educational support to students to the discretion of the clergy.
 
 
 111
 The majority also ignores Agostini v. Felton, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). Agostini involved a federal program that channeled funds for certain instructional services through the states to localities. See id. at 207-09, 117 S.Ct. at 2003, 138 L.Ed.2d at 404-06. The enabling statute directed that the services "be 'secular, neutral, and nonideological,' " and be made available to all eligible children, including those enrolled in private schools. Id. at 209-12, 117 S.Ct. at 2004, 138 L.Ed.2d at 405-07. To comply with the statute, New York City instructed teachers who chose to provide services at private schools "not [to] introduce any religious matter into their teaching or become involved in any way with the religious activities of the private schools." Id. It also required that classrooms used by the program be free of religious symbols. See id. Finally, it sent a field supervisor to visit each teacher's classroom at least once a month without prior notice. See id. at 212-14, 117 S.Ct. at 2005, 138 L.Ed.2d at 407-09. The Court upheld this implementation strategy, finding no excessive entanglement. See id. at 232-36, 117 S.Ct. at 2015-16, 138 L.Ed.2d at 420-22.
 
 
 112
 Agostini demonstrates that CIS does not result in excessive entanglement. Like New York City, BISD prohibits the mention of religious subjects. The restriction on religious garb and the silence of CIS volunteers as to their religious affiliation parallel New York City's proscription against religious symbols in classrooms. New York City's oversight of its teachers was less intrusive than BISD's monitoring of CIS sessions. This distinction, however, fails to lead to the conclusion that the Program entails excessive entanglement. As with all volunteer programs, school officials monitor CIS sessions to insure that no problems arise. Cf. Board of Educ. of Westside Community Schs. v. Mergens, 496 U.S. 226, 252-53, 110 S.Ct. 2356, 2373, 110 L.Ed.2d 191, 217-18 (1990) (plurality) (finding no excessive entanglement where statute allowed a teacher to attend a religious student club's meetings "merely to ensure good order and good behavior"). Indeed, other aspects of CIS that the majority deems objectionable--the recruitment of volunteers from one constituency; the allocation of public school facilities, personnel and time to CIS; and the manner in which students become participants in CIS--also are characteristics common to all volunteer programs. As such, they too fail to evince excessive entanglement. Cf. Roemer, 426 U.S. at 764, 96 S.Ct. at 2353, 49 L.Ed.2d at 197-98 (finding no excessive entanglement where the government's contacts with a religiously-affiliated college were "not likely to be any more entangling than the inspections and audits incident to the normal process of colleges' accreditations by the State"). The district court therefore did not err in concluding that the Program "has sufficient guidelines to ensure no excessive entanglement between church and state."
 
 IX
 
 113
 Like the Lemon test, Justice O'Connor's endorsement test has purpose and effect prongs.[30] See Lynch, 465 U.S. at 690, 104 S.Ct. at 1368, 79 L.Ed.2d at 620-21 (O'Connor, J., concurring). The purpose prong focuses on "whether [or not] the government intends to convey a message of endorsement or disapproval of religion." Id. at 691, 104 S.Ct. at 1368, 79 L.Ed.2d at 621-22 (O'Connor, J., concurring). To determine the government's purpose, we examine the pertinent legislative text, the legislative history, and the interpretation of the legislation by a responsible administrative agency. See Wallace, 472 U.S. at 75, 76, 105 S.Ct. at 2499, 2500, 86 L.Ed.2d at 55, 56 (O'Connor, J., concurring in the judgment). The endorsement test's effect prong considers whether or not the government, regardless of its actual intent, communicates the message that it endorses or disapproves of religion. See Lynch, 465 U.S. at 692, 104 S.Ct. at 1369, 79 L.Ed.2d at 622 (O'Connor, J., concurring). This inquiry proceeds from the perspective of the reasonable observer, who presumably knows about the pertinent legislative text, the legislative history, and the interpretation of the legislation by a responsible administrative agency, as well as about the history and context of the community in which the case has arisen. See Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 780-81, 115 S.Ct. 2440, 2455-56, 132 L.Ed.2d 650, 672-73 (1995) (O'Connor, J., concurring in part and concurring in the judgment); Wallace, 472 U.S. at 76, 105 S.Ct. at 2500, 86 L.Ed.2d at 56 (O'Connor, J., concurring in the judgment).
 
 
 114
 The majority holds that CIS does not pass the endorsement test. "By adopting a counseling program specifically designed for volunteer clergy only, then underscoring [the clergy's] ... exalted position by taking students out of academic classes at special times during the school day to participate in this project, [BISD] ... unmistakably endorse[s] religion," it says. In arriving at this assessment, the majority accepts the plaintiffs' argument that the exclusion of non-clergy volunteers causes the Program to convey a message in favor of religion.
 
 
 115
 The summary judgment record is at loggerheads with the majority's determination. The evidence is legally insufficient to find that BISD intends to endorse religion. See supra Parts V & VII (discussing the legal sufficiency of the evidence as to secular purpose). Nor does it reveal that the school district conveys a message endorsing religion. CIS is one of many volunteer programs designed to use the expertise of a particular group's members to enrich the educational experience. It resembles the other volunteer programs in that student participation is optional and a school official monitors the interaction between volunteers and students. Beyond these structural features, the Program's history discloses an aggressive effort on the part of BISD to avoid giving the impression that it favors religion. A reasonable observer, aware of all of these facts, could conclude only that the Program does not manifest an endorsement of religion. That the clergy alone serve as volunteers is legally insufficient for him to reach the contrary determination. See Capitol Square, 515 U.S. at 782, 115 S.Ct. at 2456, 132 L.Ed.2d at 673-74 (O'Connor, J., concurring in part and concurring in the judgment) (finding that a reasonable observer cannot perceive a cross on public property as an endorsement of religion where various religious and secular groups engage in expressive conduct on the property and a disclaimer of government endorsement accompanies the display); Mergens, 496 U.S. at 251-52, 110 S.Ct. at 2372-73, 110 L.Ed.2d at 216-17 (plurality) (finding that a reasonable observer cannot perceive an endorsement of religion where student clubs cover a wide range of subjects and the school makes clear that it does not support the views of student clubs); Allegheny, 492 U.S. at 632-37, 109 S.Ct. at 3122-24, 106 L.Ed.2d at 520-23 (O'Connor, J., concurring in part and concurring in the judgment) (finding that a menorah erected on public property does not equate with an endorsement of religion because it appears with a Christmas tree and a sign saluting liberty). Therefore, the majority is incorrect in holding that CIS does not pass the endorsement test.
 
 X
 
 116
 Justice Kennedy's coercion test asks whether or not "(1) the government directs (2) a formal religious exercise (3) in such a way as to oblige the participation of objectors." Jones, 977 F.2d at 970. It seeks to root out both direct and indirect coercion. See Lee, 505 U.S. at 592, 112 S.Ct. at 2658, 120 L.Ed.2d at 483-84; Allegheny, 492 U.S. at 660-61, 109 S.Ct. at 3137, 106 L.Ed.2d at 538-39 (Kennedy, J., concurring in the judgment in part and dissenting in part). In considering the possibility of indirect coercion, we look at the situation from the vantage point of the reasonable dissenter. See Lee, 505 U.S. at 593, 112 S.Ct. at 2658, 120 L.Ed.2d at 484-85.
 
 
 117
 The majority decides that CIS indirectly coerces students to partake in a religious activity. In doing so, it rejects BISD's claim that allowing students to decline to join a CIS session establishes CIS as non-coercive, and surmises that fear of persecution by administrators, faculty, and other students will induce dissenters to agree to become involved in CIS.
 
 
 118
 Once again, the summary judgment record affords no support for the holding. The majority's error in finding coercion becomes apparent upon comparing the evidence with the facts underlying prior opinions in which psychological pressure to conform was deemed to render a public school policy or practice coercive.
 
 
 119
 People ex rel. McCollum v. Board of Education of School Dist. No. 71, Champaign County, Ill., 333 U.S. 203, 205, 68 S.Ct. 461, 462, 92 L.Ed. 649, 655-56 (1948), concerned the permissibility of providing religious instruction on public school premises during regular hours. Students electing not to receive religious instruction left their classrooms and went elsewhere to continue their secular studies. See id. at 209, 68 S.Ct. at 464, 92 L.Ed. at 657-58. The Court invalidated the program of religious instruction. See id. at 209-12, 68 S.Ct. at 464-66, 92 L.Ed. at 657-59. In a separate opinion, Justice Frankfurter introduced the idea of students experiencing psychological coercion:
 
 
 120
 That a child is offered an alternative may reduce the constraint; it does not eliminate the operation of influence by the school in matters sacred to conscience and outside the school's domain. The law of imitation operates, and non-conformity is not an outstanding characteristic of children. The result is obvious pressure upon the child to attend.
 
 
 121
 Id. at 227, 68 S.Ct. at 473, 92 L.Ed. at 666-67 (Frankfurter, J.).
 
 
 122
 Worry about children being induced to partake in an activity contrary to their religious beliefs arose again in Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). The Court invalidated a requirement that students say a prayer aloud in class at the start of each school day. See id. at 422-24, 82 S.Ct. at 1262-63, 8 L.Ed.2d at 603-04. In doing so, it was unswayed by the fact that participation in the prayer was voluntary:
 
 
 123
 The Establishment Clause ... does not depend upon any showing of direct government compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not. This is not to say, of course, that laws officially prescribing a particular form of religious worship do not involve coercion of such individuals. When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain.
 
 
 124
 Id. at 430-31, 82 S.Ct. at 1267, 8 L.Ed.2d at 607-08.
 
 
 125
 The observations in McCollum and Engel were reiterated in School District of Abington Township, Pennsylvania v. Schempp, 374 U.S. 203, 205, 207, 211, 83 S.Ct. 1560, 1562, 1565, 10 L.Ed.2d 844, 848 (1963), which involved state statutes mandating a Bible reading, without comment, each school day. Under the laws, a child not wishing to participate in the Bible reading was allowed to be excused. See id. at 205, 207, 211-12, 83 S.Ct. at 1562, 1563, 1565, 10 L.Ed.2d at 848, 849-50, 851-52. The Court overturned the statutes. See id. at 223-26, 83 S.Ct. at 1572-73, 10 L.Ed.2d at 858-61. In his concurrence, Justice Brennan found the laws' excusal provisions inadequate to shield children against the risk of coercion:
 
 
 126
 [B]y requiring what is tantamount in the eyes of teachers and schoolmates to a profession of disbelief, or at least of nonconformity, the [excusal] procedure may well deter those children who do not wish to participate for any reason based upon the dictates of conscience from exercising an indisputably constitutional right to be excused.... [E]ven devout children may well avoid claiming their right and simply continue to participate in exercises distasteful to them because of an understandable reluctance to be stigmatized as atheists or nonconformists simply on the basis of their request.
 
 
 127
 Such reluctance to seek exemption seems all the more likely in view of the fact that children are disinclined at this age to step out of line or to flout "peer group norms."
 
 
 128
 Id. at 289-90, 83 S.Ct. at 1607, 10 L.Ed.2d at 896-97 (Brennan, J., concurring).
 
 
 129
 Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), was the most recent instance in which the Court found psychological pressure pertinent. It concerned a challenge to the inclusion of a benediction and an invocation as part of a high school graduation ceremony. See id. at 580-82, 112 S.Ct. at 2652-53, 120 L.Ed.2d at 476-78. The Court, in an opinion by Justice Kennedy, invalidated the prayers because the particular context induced dissenters to participate. See id. at 586-99, 112 S.Ct. at 2655-61, 120 L.Ed.2d at 479-88. It specifically found that school officials' pervasive control over the graduation ceremonies "place[d] public pressure, as well as peer pressure, on attending students to stand as a group or, at least, maintain respectful silence during the invocation and benediction." Id. at 593-94, 597, 112 S.Ct. at 2658-59, 2660, 120 L.Ed.2d at 484. It also rejected the contention that making attendance at graduation ceremonies voluntary enabled the prayers to escape the Establishment Clause's reach:
 
 
 130
 Everyone knows that in our society and in our culture high school graduation is one of life's most significant occasions. A school rule which excuses attendance is beside the point. Attendance may not be required by official decree, yet it is apparent that a student is not free to absent herself from the graduation exercise in any real sense of the term "voluntary," for absence would require forfeiture of those intangible benefits which have motivated the student through youth and all her high school years.
 
 
 131
 Id. at 595, 112 S.Ct. at 2659, 120 L.Ed.2d at 486. The combined effect of psychological pressure and the distinctive character of a graduation ceremony led the Court to conclude that dissenters were coerced to participate in the prayers. See id. at 588, 598, 112 S.Ct. at 2656, 2661, 120 L.Ed.2d at 481-82, 487-88.
 
 
 132
 The plaintiffs have failed to elicit evidence legally sufficient to support their contention that students enrolled in BISD schools face a dilemma similar to that which confronted students in earlier cases. They offer only general statements about the risk of coercion. For example, Rabbi Hyman worries about "[t]he very real possibility of students being set apart and ostracized," but provides no basis for his opinion, except for "the inherent dangers and hazards accompanying the 'Clergy in Schools' program." His statement and others like it cannot carry the plaintiffs' summary judgment burden because they are speculative. Moreover, no evidence suggests that attendance at CIS sessions represents a social convention of students, indicates who can learn of a student's refusal to participate, or discloses the setting and manner in which school officials invite students. Given this state of the summary judgment record, a reasonable fact-finder could not infer that psychological pressure will coerce students to take part in a CIS session. Cf. Mergens, 496 U.S. at 261, 110 S.Ct. at 2377, 110 L.Ed.2d at 222-23 (Kennedy, concurring in part and concurring in the judgment) (finding no coercion, in part, because "[t]he Act does not authorize school authorities to require, or even to encourage, students to become members of a religious club or to attend a club's meetings"). The majority therefore errs in holding that CIS fails the coercion test.
 
 XI
 
 133
 We must review a claim alleging a violation of the Establishment Clause with close attention to the evidence. See Lee, 505 U.S. at 597, 112 S.Ct. at 2660-61, 120 L.Ed.2d at 487 ("Our Establishment Clause jurisprudence remains a delicate and fact-sensitive one."); Lynch, 465 U.S. at 679, 104 S.Ct. at 1362, 79 L.Ed.2d at 613-14 (applying the Lemon test) (examining the particular context in which the government practice occurred); id. at 694, 104 S.Ct. at 1370, 79 L.Ed.2d at 623-24 (O'Connor, J., concurring) ("Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion."). Only then can we fulfill our obligation as constitutional adjudicators "to distinguish between real threat and mere shadow." Schempp, 374 U.S. at 308, 83 S.Ct. at 1616, 10 L.Ed.2d at 906-07 (Goldberg, J., concurring). The majority shirks this duty. It turns a blind eye to the fact that the plaintiffs have failed to carry their summary judgment burden as to either standing or the merits.[31] As a result, the clergy are precluded from receiving a government benefit available to other constituencies--a chance to form a volunteer group that uses the unique skills of its members to further the education of students attending public school in Beaumont.
 
 
 134
 The majority's decision puts BISD in a constitutionally untenable position. The school district now finds itself bound to treat the clergy differently than all other groups desiring to join its volunteer movement. But the Establishment Clause proscribes such discrimination. See Everson, 330 U.S. at 18, 67 S.Ct. at 513, 91 L.Ed. at 724 ("[The Establishment Clause] does not require the state to be [the] ... adversary [of religious believers]. State power is no more to be used so as to handicap religions, than it is to favor them."); see also McDaniel v. Paty, 435 U.S. 618, 641, 98 S.Ct. 1322, 1335, 55 L.Ed.2d 593, 610-11 (1978) (Brennan, J., concurring in the judgment) ("The Establishment Clause does not license government to treat religion and those who teach or practice it, simply by virtue of their status as such, as subversive of American ideals and therefore subject to unique disabilities."); Schempp, 374 U.S. at 306, 83 S.Ct. at 1615, 10 L.Ed.2d at 905-06 (Goldberg, J., concurring) ("[U]ntutored devotion to the concept of neutrality can lead to the invocation or approval of results which partake ... of a brooding and pervasive devotion to the secular and a passive, or even active, hostility to the religious. Such results are not only not compelled by the Constitution, but, it seems to me, are prohibited by it."). This consequence of the majority's disposition demonstrates why we must examine the evidence vigilantly before arriving at a determination in an Establishment Clause case.
 
 
 135
 We should affirm the grant of summary judgment to BISD. The district court correctly held that the plaintiffs have failed to carry their summary judgment burden on either the challenge to their standing or the challenge to their Establishment Clause claim. In reaching the contrary determination, the majority renders CIS the latest example of how character education has become "the ultimate casualty of the courts' careless Establishment Clause jurisprudence." Ingebretsen, 88 F.3d at 287 (Jones, J., dissenting from denial of rehearing en banc).
 
 
 136
 Accordingly, I dissent.
 
 
 
 [1]
 Susan, Mary, and Lisa Doe are parents and a grandparent of minor children who attend elementary and secondary schools of the Beaumont Independent School District in which the Program that is the subject of this litigation has been implemented
 
 
 [2]
 BISD has averred that the Program has been modified since the commencement of this litigation. The judgment we render today, and the instructions accompanying our remand, apply equally to the version of the Program currently in effect, regardless of any insignificant modifications or any amendments that fail to change substantially the aspects that we here reject
 
 
 [3]
 Over the years, these groups have included business partners, fraternities and sororities, the Beaumont Optimist Club, the Junior League, Junior Achievement, refinery workers, police officers, Special Friends, and retired and senior volunteers
 
 
 [4]
 After he was hired, but before began to serve as superintendent, Dr. Thomas informed area clergy at a luncheon that prayer needed to return to public schools. BISD asserts that the speech was unrelated to the Program and reflected only Dr. Thomas's personal views on public school prayer
 
 
 [5]
 The Program "Fact Sheet" includes the following as suggested topics: dress code, why have rules, violence, peer pressure, racial issues, stereotyping, jealousy, unity, self-esteem, self-discipline, setting goals, divorce, diversity, gossip, harassment, alcohol, drugs and respect
 
 
 [6]
 Appellant brief, p.4 (quoting Defendant's Exhibit 8)
 
 
 [7]
 Counsel for BISD stated at oral argument that BISD has instituted a consent policy with respect to the Program. Counsel did not, however, argue that this case is now moot, that the Program is no longer in place, that the Program had been so transmuted that it is not the same, or that what had been done since the appeal was filed was material to the hearing; rather, counsel stated that she felt there was no problem with the Program from the onset. For purposes of this appeal, then, we consider the Program as it existed before the district court
 
 
 [8]
 Although BISD denies such a meeting took place, we consider it for purposes of BISD's summary judgment motion, viewing the version of the facts most favorable to the non-movant
 
 
 [9]
 Aubrey v. School Bd. of Lafayette Parish, 92 F.3d 316, 318 (5th Cir.1996) (citing Elliott v. Lynn, 38 F.3d 188, 190 (5th Cir.1994), cert. denied, 514 U.S. 1117, 115 S.Ct. 1976, 131 L.Ed.2d 865 (1995))
 
 
 [10]
 FED.R.CIV.P. 56(c)
 
 
 [11]
 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)
 
 
 [12]
 Id. at 472-73, 102 S.Ct. at 758-59
 
 
 [13]
 Murray v. City of Austin, 947 F.2d 147, 151 (5th Cir.1991) (internal quotation marks and citation omitted), cert. denied, 505 U.S. 1219, 112 S.Ct. 3028, 120 L.Ed.2d 899 (1992)
 
 
 [14]
 Valley Forge, 454 U.S. at 472, 102 S.Ct. at 758
 
 
 [15]
 Murray, 947 F.2d at 151 (internal quotation marks and citation omitted)
 
 
 [16]
 Valley Forge, 454 U.S. at 485, 102 S.Ct. at 765
 
 
 [17]
 Id
 
 
 [18]
 Id. at 486, 102 S.Ct. at 766
 
 
 [19]
 Id
 
 
 [20]
 See id. at 486-87 n. 22, 102 S.Ct. at 766 n. 22. The Court rejected respondents' argument that any person asserting an Establishment Clause violation has a "spiritual stake" sufficient to confer standing. The Court explained that the "spiritual stake" language was taken from its decision in Abington School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), a case in which the plaintiffs were children who attended public schools where the Bible was read each morning, and their parents. The Court in Schempp noted: "It goes without saying that the laws and practices involved here can be challenged only by persons having standing to complain.... The parties here are school children and their parents, who are directly affected by the laws and practices against which their complaints are directed. These interests surely suffice to give the parties standing to complain." Id. at 225 n. 9, 83 S.Ct. at 1573 n. 9. The Court in Valley Forge explained, "[t]he plaintiffs in Schempp had standing, not because their complaint rested on the Establishment Clause--for as Doremus demonstrated, that is insufficient--but because impressionable schoolchildren were subjected to unwelcome religious exercises or were forced to assume special burdens to avoid them." Valley Forge, 454 U.S. at 487 n. 22, 102 S.Ct. at 767 n. 22
 
 
 [21]
 70 F.3d 402 (5th Cir.1995)
 
 
 [22]
 Id. at 408 (citing Gonzales v. North Township of Lake County, Ind., 4 F.3d 1412, 1415-16 (7th Cir.1993); Cammack v. Waihee, 932 F.2d 765, 770 (9th Cir.1991) (surveying cases), cert. denied, 505 U.S. 1219, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992); Friedmann v. Sheldon Community Sch. Dist., 995 F.2d 802, 803 (8th Cir.1993)). In Duncanville we concluded that the student and her father lacked taxpayer standing to challenge the school district's practice of permitting distribution of Bibles to students by a private organization, as there was no evidence that the district expended any funds or resources on distribution. See also Freedom From Religion Found. v. Zielke, 845 F.2d 1463 (7th Cir.1988). The appellants in that case failed to satisfy the two threshold criteria for establishing municipal taxpayer standing: "First, the appellants failed to allege or prove that Grams [a resident of La Crosse and an appellant] actually is a La Crosse municipal taxpayer. Second, even if we [the court] presume that Grams is a taxpayer, the appellants did not establish that the City of La Crosse has used tax revenues on the allegedly unconstitutional display in Cameron Park." Id. at 1470
 
 
 [23]
 ASARCO, Inc. v. Kadish, 490 U.S. 605, 613-14, 109 S.Ct. 2037, 2043, 104 L.Ed.2d 696 (1989) (distinguishing the standing requirements for municipal taxpayers from those for state taxpayers, who must have a "direct injury" like that required of federal taxpayers); see also Cammack, 932 F.2d at 770 (concluding that "municipal taxpayer standing simply requires the 'injury' of an allegedly improper expenditure of municipal funds, and in this way mirrors our [the 9th Circuit] threshold for state taxpayer standing."); Zielke, 845 F.2d at 1470 (applying the two threshold criteria for establishing municipal taxpayer standing)
 
 
 [24]
 BISD's record citation in support of this allegation is inapt; it makes no reference to acquaintance whatsoever, failing to back up this statement
 
 
 [25]
 Duncanville, 70 F.3d at 409 n. 11
 
 
 [26]
 Id
 
 
 [27]
 Clergy visited Central High--where Jane Doe and June Doe attended tenth grade during 1996-97--twice during the school year and met with seventy students out of a student population of 1,695
 
 
 [28]
 Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Accord Berger v. Rensselaer Central Sch. Corp., 982 F.2d 1160, 1164 n. 4 (7th Cir.) (stating that the district court correctly decided that the plaintiffs had standing to challenge a policy permitting the Gideons to distribute Bibles, even though the children had not personally received Gideon materials [the Gideons did not distribute Bibles to the fifth grade that year so as to sidestep litigation], as the school board had affirmed its policy permitting distribution and could have renewed the allegedly wrongful activity at any time), cert. denied, 508 U.S. 911, 113 S.Ct. 2344, 124 L.Ed.2d 254 (1993)
 
 
 [29]
 88 F.3d 274, 278 (5th Cir.) (quoting Karen B. v. Treen, 653 F.2d 897, 902 (5th Cir.1981), aff'd, 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982)); see also Lee v. Weisman, 505 U.S. 577, 584, 112 S.Ct. 2649, 2654, 120 L.Ed.2d 467 (1992) (holding plaintiff had standing because "from the record it appears likely, if not certain, that an invocation and benediction will be conducted at her high school graduation.")
 
 
 [30]
 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)
 
 
 [31]
 Id. at 592, 112 S.Ct. at 2658
 
 
 [32]
 Id. at 593, 112 S.Ct. at 2658
 
 
 [33]
 Id
 
 
 [34]
 Id. at 593, 112 S.Ct. at 2658-59. The Court noted that "[r]esearch in psychology supports the common assumption that adolescents are often susceptible to pressure from their peers towards conformity, and that the influence is strongest in matters of social convention." Id. at 593, 112 S.Ct. at 2659 (citing Brittain, Adolescent Choices and Parent-Peer Cross-Pressures, 28 Am. Soc. Rev. 385 (June 1963); Clasen & Brown, The Multidimensionality of Peer Pressure in Adolescence, 14 J. of Youth & Adolescence 451 (Dec.1985); Brown, Clasen, & Eicher, Perceptions of Peer Pressure, Peer Conformity Dispositions, and Self-Reported Behavior Among Adolescents, 22 Developmental Psychology 521 (July 1986))
 
 
 [35]
 Our determination that the Does have alleged sufficient actual or threatened injury to confer standing makes it unnecessary to reach the Does's alternative claim of taxpayer standing
 
 
 [36]
 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)
 
 
 [37]
 Id. at 612-13, 91 S.Ct. at 2111
 
 
 [38]
 As the district court did not address the Program's constitutionality under the Texas Constitution, we decline to do so on appeal. We do not refrain for lack of authority to consider the issue in our de novo review of the district court's grant of summary judgment, but because we find it unnecessary in light of our ruling under the United States Constitution
 
 
 [39]
 Lemon, 403 U.S. at 612-13, 91 S.Ct. at 2111
 
 
 [40]
 See, e.g., Edwards v. Aguillard, 482 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987); Wallace v. Jaffree, 472 U.S. 38, 56, 105 S.Ct. 2479, 2489-90, 86 L.Ed.2d 29 (1985) (striking down statute for lacking secular purpose)
 
 
 [41]
 Lee, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (invalidating school district's policy permitting school principals to invite clergy to give invocations and benedictions in form of "nonsectarian" prayer at graduation ceremonies)
 
 
 [42]
 Jones v. Clear Creek Indep. Sch. Dist., 977 F.2d 963, 970 (5th Cir.1992) (relying on Lee, 505 U.S. at 586, 112 S.Ct. at 2655), cert. denied, 508 U.S. 967, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993)
 
 
 [43]
 County of Allegheny v. ACLU, 492 U.S. 573, 592-93, 109 S.Ct. 3086, 3100-01, 106 L.Ed.2d 472 (1989)
 
 
 [44]
 Ingebretsen, 88 F.3d at 280 (5th Cir.1996) (internal quotation marks and citation omitted)
 
 
 [45]
 Id. (quoting Allegheny, 492 U.S. at 593, 109 S.Ct. at 3101)
 
 
 [46]
 See, e.g., Everson v. Bd. of Educ. of Ewing, 330 U.S. 1, 15-16, 67 S.Ct. 504, 511-12, 91 L.Ed. 711 (1947)
 
 
 [47]
 See supra note 4
 
 
 [48]
 The Does also highlight testimony by program coordinator and BISD board member, Reverend Whittaker, who, when asked, "[w]ell, as a governmental question or a political question, would you like to see this nation adopt Christianity as the state religion?" responded that he "would like to see Christianity to be utilized in any form it can be in order to implement better morals or persons, yes."
 
 
 [49]
 Bethel Sch. Dist. v. Fraser, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (finding that school district had authority to impose sanctions on student in response to his offensively lewd and indecent speech, which was not protected by the First Amendment, and noting that the role and purpose of the public school system is to inculcate the fundamental values of "habits and manners of civility," including tolerance of divergent political and religious views); see also Jones, 977 F.2d at 965-66
 
 
 [50]
 Aguillard, 482 U.S. at 586-87, 107 S.Ct. at 2579
 
 
 [51]
 See Lynch v. Donnelly, 465 U.S. 668, 690-91, 104 S.Ct. 1355, 1368-69, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring) (noting purpose prong "is not satisfied ... by mere existence of some secular purpose, however, dominated by religious purposes."); Aguillard, 482 U.S. at 589-94, 107 S.Ct. at 2580-83 (finding pre-eminent purpose of Louisiana Balanced Treatment for Creation Science in Public School Instruction Act was to endorse religion); Stone v. Graham, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199, (1980) ("The pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature."); Schempp, 374 U.S. at 223, 83 S.Ct. at 1572 (holding unconstitutional daily reading of Bible verses and Lord's Prayer despite school district's assertion of secular purpose of promoting moral values)
 
 
 [52]
 See id. ("[T]he legislature's provision for excusing students who do not desire to participate in the daily prayer session betrays its recognition of the fundamentally religious character of the exercise.")
 
 
 [53]
 Lynch, 465 U.S. at 690, 104 S.Ct. at 1368 (O'Connor, J., concurring)
 
 
 [54]
 Aguillard, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510
 
 
 [55]
 Id. at 583-84, 107 S.Ct. at 2577
 
 
 [56]
 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)
 
 
 [57]
 Id. 117 S.Ct. at 2010
 
 
 [58]
 Id. at 2014; see also Rosenberger v. Rector and Visitors of the University of Virginia, 515 U.S. 819, 842, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) ("It does not violate the Establishment Clause for a public university to grant access to its facilities in a religion-neutral basis to a wide spectrum of student groups, including groups which use meeting rooms for sectarian activities ....") (emphasis added); Board of Ed. of Kiryas Joel Village Sch. Dist. v. Grumet, 512 U.S. 687, 696, 114 S.Ct. 2481, 2487, 129 L.Ed.2d 546 (1994) (" 'A proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of "neutrality" toward religion,' favoring neither one religion over others nor religious adherents collectively over nonadherents.") (quoting Committee for Public Ed. & Religious Liberty v. Nyquist, 413 U.S. 756, 792-793, 93 S.Ct. 2955, 2975, 37 L.Ed.2d 948 (1973)); Zobrest v. Catalina Foothills Sch. Dist., 509 U.S. 1, 10, 113 S.Ct. 2462, 2467, 125 L.Ed.2d 1 (1993) (holding that permitting deaf student to bring his state-employed sign-language interpreter did not impermissibly advance religion because governmental program was administered based on religion-neutral criteria)
 
 
 [59]
 We note, however, that these two opposing fact patterns present different, albeit related, concerns. When the government administers programs and distributes benefits according to neutral criteria which only incidentally benefit religious organizations, there is little danger that people will perceive any official endorsement of those organizations' beliefs. By contrast, there is a much greater danger that, when religious organizations and representatives participate in the affairs of government--at least when they do so not as an indistinguishable part of a larger effort, but rather in a manner clearly distinct and identifiable--such participation will create the clear impression that the government has reached out to such religious organizations and representatives precisely because of their religious affiliations. On a similar note, although we may no longer presume that public employees will inculcate religion simply because they are in a sectarian environment, Agostini, 117 S.Ct. at 2010, it does not follow that we should, or will, abandon the close scrutiny we have traditionally applied to any introduction of religion into public schools. See, e.g., Duncanville, 70 F.3d at 406-07 (holding unconstitutional school district's practice of allowing its employees to participate and supervise student prayers during basketball games and practices). For Establishment Clause examinations, the public primary and secondary school setting is sui generis and thus has no true analog. See Aguillard, 482 U.S. at 583-84, 107 S.Ct. at 2577
 
 
 [60]
 Cf. Kiryas Joel, 512 U.S. at 698, 114 S.Ct. at 2488 ("State may not delegate its civic authority to group chosen according to religious criterion"); Larkin v. Grendel's Den, Inc., 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982) (holding unconstitutional Massachusetts statute vesting in the governing bodies of churches and schools the power effectively to veto applications for liquor licenses within a 500-foot radius of the church or school)
 
 
 [61]
 Ingebretsen, 88 F.3d at 279
 
 
 [62]
 The Program contrasts sharply with the graduation prayers we held constitutional in Jones. There, not only did the prayers make only a small part of the larger exercise, the attending students elected to attend the ceremony--though as the Supreme Court noted in Lee, graduation ceremonies are not "voluntary" exercises for the graduating students--and do not have the type of personal interaction with the religious aspects of the exercise as do the students selected to participate in the Program. Jones, 977 F.2d at 967
 
 
 [63]
 Lee, 505 U.S. at 587-88, 112 S.Ct. at 2655-56; see also Ingebretsen, 88 F.3d at 279 ("The statute [School Prayer Statute] will inevitably involve school officials in determining which prayers are 'nonsectarian and nonproselytizing' and in determining who gets to say the prayer at each event. To the extent that school administrators participate in prayers in their official capacity or review the content of prayers to ensure that they meet these requirements, the School Prayer Statute excessively entangles government with religion.")
 
 
 [64]
 BISD's involvement in the Program surpasses that of the school in Jones as well. There, school officials did nothing more than conduct a once-a-year review of unsolicited material for sectarianism. Jones, 977 F.2d at 967-68
 
 
 [65]
 Id. at 970 (relying on Lee, 505 U.S. at 586, 112 S.Ct. at 2655), cert. denied, 508 U.S. 967, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993)
 
 
 [66]
 See Aguillard, 482 U.S. at 584, 107 S.Ct. at 2578 ("The State exerts authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure.")
 
 
 [67]
 See Lee, 505 U.S. at 592-94, 112 S.Ct. at 2658-59
 
 
 [68]
 Lynch, 465 U.S. at 687, 104 S.Ct. at 1367
 
 
 [69]
 Id. at 680, 104 S.Ct. at 1362
 
 
 [70]
 Id. at 686, 104 S.Ct. at 1366
 
 
 [71]
 Id. at 671, 104 S.Ct. at 1358
 
 
 [72]
 Id. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring)
 
 
 [73]
 Allegheny, 492 U.S. at 595-96, 109 S.Ct. at 3102-03
 
 
 [74]
 Id. at 580-81, 109 S.Ct. at 3094
 
 
 [75]
 Id. at 601-02, 109 S.Ct. at 3105
 
 
 [76]
 Id. at 617-18, 109 S.Ct. at 3113-14
 
 
 [77]
 Id. at 598, 109 S.Ct. at 3104
 
 
 [78]
 BISD's reliance on Jones in support of its argument that the Program does not convey the message that religion is favored or preferred over other beliefs is entirely misplaced. There, the school merely permitted students to deliver nonsectarian, nonproselytizing prayers if they voted to do so. Jones, 977 F.2d at 968-69. The school policy was "passive" neither mandating prayer nor prohibiting it, thereby reducing the likelihood that students would perceive the student-led, student-initiated prayers as an endorsement of religion by the school. Id. at 968. Here, by contrast, the school engineered and implemented the Program from beginning to end. There is no mistaking the fact that the clergy are in the schools at the school's behest
 
 
 [79]
 See Ingebretsen, 88 F.3d at 280 ("The School Prayer Statute is an unconstitutional endorsement of religion because it allows school officials in their capacity as representatives of the state to lead students in prayer and sets aside special time for prayer that it does not set aside for anything else. It also places the coercive power of the state in the position of forcing students to attend school and then forcing them to listen to prayers offered there.")
 
 
 [80]
 One document lists as a strength of the Program "Students aware that ministers are aware of what's happening in schools." Another document lists as a Do (as opposed to a Don't) "let students know you [a clergy member] are human." BISD has, moreover, repeatedly stated that one of its primary goals is to provide members of the clergy with an opportunity to connect with the students. BISD acknowledges that this goal is distinct from its desire to give students a chance to discuss issues that may be troubling them. BISD has failed to explain why a public school includes in its mission goals designed to aid religious representatives
 
 
 [81]
 When specifically asked the question "Are the children aware that the counselors all have a religious tie?" Counselor for BISD responded, "The students are aware that this is a 'Clergy in School' Program." Later, Counselor for BISD asserted that Plaintiff Doe testified at the TRO hearing she did not "even know how the Program worked." In response to the question whether Plaintiff Doe knew that the counselors were all clergy, Counselor for BISD stated "I don't know even she knew that." Not once did Counselor suggest that the children were not aware that volunteers in the Program were all members of the clergy
 
 
 [82]
 See, e.g., Agostini, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (federally-funded program that sent public school teachers into parochial schools to provide remedial education); Roemer v. Board of Pub. Works of Md., 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (public aid program to colleges and universities)
 
 
 [83]
 Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)
 
 
 [84]
 Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 47, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)
 
 
 [85]
 See, e.g., Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (holding that, because university's student activity fund ("SAF") was available to broad range of groups under neutral guidelines, SAF constituted limited public forum and University could not, therefore, deny funds to Christian newspaper because of editorial viewpoint); Board of Educ. of Westside Community Schls. v. Mergens, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (holding school's policy of granting access to school facilities after school hours created limited public forum and, therefore, school could not deny such access to student religious organization)
 
 
 [86]
 Introducing elements of the community into public school context is, of course, a laudable practice. It is simply constrained by the Establishment Clause
 
 
 [87]
 In fact, Judge Garza's argument is arguably more relevant to Lee 's graduation ceremony than to the Program because at least, in a graduation ceremony, the State-introduced religious and nonreligious components are directed at the same set of students. Nevertheless, the Supreme Court's focus remained squarely on the graduation prayer, just as our focus must be on the "Clergy in School" Program independent of BISD's other volunteer programs
 
 
 [88]
 Judge Garza additionally asserts that the Does do not have taxpayer standing. As we do not reach that issue in our opinion, it is unnecessary to respond to Judge Garza's arguments. See supra note 35
 
 
 [89]
 Schempp, 374 U.S. at 289-90, 83 S.Ct. at 1607, 10 L.Ed.2d at 896-97
 
 
 [1]
 Dr. Thomas wanted the group of students to include "students who excel, regular students, those that are high risk, and invisible students."
 
 
 [2]
 Other groups involved in the school district's volunteer effort included employees of Mobil Oil, senior citizens, and attorneys
 
 
 [3]
 The parent is the mother of one of the plaintiffs
 
 
 [4]
 The flyer provided statistics showing how youths involved with religious organizations are less likely to engage in undesirable behavior. It concluded: "[A] strong RELIGIOUS base enhances education for socioeconomically disadvantaged children!"
 
 
 [5]
 Mike Thompson, the Minister of the Spindletop Unitarian Church, and Peter E. Hyman, the Rabbi for Temple Emanuel, later expressed concern to Dr. Thomas about the comment
 
 
 [6]
 A number of parents learned about the Program from a local newspaper article that appeared at the beginning of the school year. The article began with the following statement, which alarmed some parents: "In an age when police officers roam school halls to enforce the peace, Beaumont school superintendent Carrol Thomas would like to see ministers in the same place enforcing values."
 
 
 [7]
 During the pendency of this appeal, BISD instituted a parental consent requirement
 
 
 [8]
 Dr. Thomas subsequently explained that his unwillingness to discuss CIS with parents reflected his desire for parents initially to direct their concerns about the Program to school principals, and said that he had expressed willingness to meet with ADL members who had children enrolled in the Beaumont public schools
 
 
 [9]
 The plaintiffs' parents and grandparent brought the suit as the plaintiffs' next friends. See FED.R.CIV.P. 17
 
 
 [10]
 The plaintiffs brought their Establishment Clause claim pursuant to 42 U.S.C. § 1983. See Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 617, 99 S.Ct. 1905, 1916, 60 L.Ed.2d 508, 522 (1979)
 
 
 [11]
 In a letter to the plaintiffs' counsel, one of BISD's attorneys stated that Dr. Thomas "has confirmed that the 'Clergy in Schools' program is being expanded to include the participation of non-clergy professional groups." Dr. Thomas, however, testified at the hearing on the motion for a TRO that he had decided against involving non-clergy in CIS
 
 
 [12]
 In response to the denial of their motion for a TRO, the plaintiffs immediately filed an appeal, but later withdrew it
 
 
 [13]
 The majority neglects to mention ancillary matters that touch on the paramount issues before us. First, the absence of a separate document setting forth the district court's judgment does not prevent us from hearing this appeal because neither the plaintiffs nor BISD has objected to this omission. See Bankers Trust Co. v. Mallis, 435 U.S. 381, 384-87, 98 S.Ct. 1117, 1120-21, 55 L.Ed.2d 357, 361-63 (1978) (per curiam). Second, the district court's denial of standing applied to all claims. Third, the plaintiffs stated during oral argument that they do not allege a violation of the Family Educational Rights and Privacy Act, see 20 U.S.C. § 1232h(b). Fourth, we do not address the claim that CIS also violates the Establishment Clause by favoring Christian religions over non-Christian religions because the plaintiffs failed to raise the claim below. See Little v. Liquid Air Corp., 37 F.3d 1069, 1071 n. 1 (5th Cir.1994) (en banc) (per curiam) ("plaintiffs may not advance on appeal new theories or raise new issues not properly before the district court to obtain reversal of the summary judgment"). Fifth, we do not decide if the conduct of BISD during this litigation "has sown sectarian division" because the plaintiffs raise the issue for the first time in their reply brief. See United States v.Mann, 161 F.3d 840, 867 n. 91 (5th Cir.1998) (applying the plain error rule to determine whether or not to consider an argument raised for the first time in the reply brief); Abbott v. Local Union No. 142 of United Ass'ns of Journeymen & Apprentices of Pipe Fitting Indus., 429 F.2d 786, 788 (5th Cir.1970) (simply refusing to consider argument raised for the first time in the reply brief). Finally, the "Doe" pseudonym is an inappropriate way to identify the plaintiffs because the plaintiffs neither have appealed the district court's denial of their motion to proceed anonymously, see Doe v. Beaumont Indep. Sch. Dist., 172 F.R.D. 215 (E.D.Tex.1997), nor have requested permission to proceed anonymously on appeal
 I disagree with the manner in which the majority treats two other ancillary issues. The majority conveys the impression that it considers the plaintiffs' state constitutional claim to possess merit, even though the order underlying this appeal only addresses standing and the Establishment Clause claim. See Eaton v. Courtaulds of N. Am., Inc., 578 F.2d 87, 90 (5th Cir.1978) (indicating that the unambiguous language determines an order's meaning). It also wrongly treats statements by BISD's counsel during argument before us as competent summary judgment evidence. See 7547 Corp. v. Parker & Parsley Dev. Partners, L.P., 38 F.3d 211, 220 (5th Cir.1994) (refusing to consider document offered for the first time on appeal that supported reversal of district court's grant of summary judgment).
 
 
 [14]
 As it concludes that the threat of psychological pressure to acquiesce establishes an injury in fact, the majority forgoes consideration of whether or not the plaintiffs have taxpayer standing
 
 
 [15]
 I discuss fully the shortcomings of the evidence as to psychological pressure in a later section of this opinion. See infra Part X
 
 
 [16]
 The parents and grandparent cannot establish standing based on their status as taxpayers. They sue only as next friends of the plaintiffs. See Pulido v. Bennett, 848 F.2d 880, 888 (8th Cir.1988) ("[b]ecause [the plaintiff] ... sued as next friend of the children in her care, her standing depended on that of the children"), rev'd on other grounds, 860 F.2d 296, 297-98 (8th Cir.1988). Also, the complaint does not disclose a cause of action by the adult plaintiffs in their individual capacities. See Steele v. Van Buren Pub. Sch. Dist., 845 F.2d 1492, 1495 (8th Cir.1988) (explaining why a parent can raise an Establishment Clause in his individual capacity claim challenging an activity occurring in his child's school)
 
 
 [17]
 The Fourteenth Amendment's Due Process Clause makes the Establishment Clause applicable to the states and their political subdivisions. See School Dist., Penn. v. Schempp, 374 U.S. 203, 215-16, 83 S.Ct. 1560, 1567-68, 10 L.Ed.2d 844, 854-55 (1963)
 
 
 [18]
 For discussion of Justice O'Connor's view of excessive entanglement, the final prong of the Lemon test, see infra note 30
 
 
 [19]
 Justices O'Connor and Kennedy, however, have criticized each other's tests. Compare County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 627-32, 109 S.Ct. 3086, 3119-22, 106 L.Ed.2d 472, 516-20 (1989) (O'Connor, J., concurring in part and concurring in the judgment) with id. at 668-77, 109 S.Ct. at 3140-46, 106 L.Ed.2d at 543-49 (Kennedy, J., concurring in the judgment in part and dissenting in part)
 
 
 [20]
 In Edwards v. Aguillard, 482 U.S. 578, 592-94, 107 S.Ct. 2573, 2582-83, 96 L.Ed.2d 510, 524-26 (1987), the Court stated on several occasions that the "primary purpose" of the legislation at issue was religious. These comments seemed to be at odds with the earlier declaration in Lynch v. Donnelly, 465 U.S. 668, 680, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604, 614-15 (1984), that a government policy or practice is invalid if "motivated wholly by religious considerations." I find no real conflict between Edwards and Lynch. Consistent with Lynch, Edwards held the subject statute unconstitutional because the measure's only purpose was religious. See Edwards, 482 U.S. at 593, 107 S.Ct. at 2582, 96 L.Ed.2d at 525 ("the purpose of the Creationist Act was to restructure the science curriculum to conform with a particular religious viewpoint"). The Court, furthermore, removed any doubt about the continuing force of what Lynch said in the post-Edwards decision Bowen v. Kendrick, 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988). In Bowen, it stated that "a court may invalidate a statute only if it is motivated wholly by an impermissible purpose." Id. at 602, 108 S.Ct. at 2570, 101 L.Ed.2d at 535-36; see also id. at 602-03, 108 S.Ct. at 2571, 101 L.Ed.2d at 535-37 ("[I]t is clear from the face of the statute that the AFLA was motivated primarily, if not entirely, by a legitimate secular purpose.... Appellees cannot, and do not, dispute that, on the whole, religious concerns were not the sole motivation behind the Act, nor can it be said that the AFLA lacks a legitimate secular purpose.")
 
 
 [21]
 As proof of religious purpose, the plaintiffs also cite Dr. Thomas' request for the clergy to provide support to students preparing for TAAS and an isolated statement of the Reverend Ollis Whitaker during the hearing on the motion for a TRO that expressed support for the use of Christianity "to implement better morals or persons." The majority makes no mention of these pieces of evidence in explaining why purpose is a genuine issue of material fact. I agree with the finding implicit in this silence that Thomas' request and Whitaker's statement cannot carry the plaintiffs' summary judgment burden. Cf. Lynch, 465 U.S. at 679-80, 104 S.Ct. at 1362, 79 L.Ed.2d at 613-14 (focusing on the full context in which the case arose because "[f]ocus[ing] exclusively on the religious component of an activity would inevitably lead to its invalidation under the Establishment Clause")
 
 
 [22]
 Like the majority, I recognize that "government may play an active role in teaching civic values, virtues, and the community's moral code, despite the fact that these values may overlap with religious beliefs." See Bowen, 487 U.S. at 604 n. 8, 108 S.Ct. at 2571 n. 8, 101 L.Ed.2d at 537 n. 8 ("We also see no reason to conclude that the AFLA serves an impermissible religious purpose simply because some of the goals of the statute coincide with the beliefs of certain religious organizations."); Board of Educ. v. Pico, 457 U.S. 853, 864, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435, 444-45 (1982) (plurality) ("We have also acknowledged that public schools are vitally important 'in the preparation of individuals for participation as citizens,' and as vehicles for 'inculcating fundamental values necessary to the maintenance of the democratic political system.' We therefore are in full agreement with petitioners that local school boards must be permitted 'to establish and apply their curriculum in such a way as to transmit community values,' and that 'there is a legitimate and substantial community interest in promoting respect for authority and traditional values, be they social, moral, or political.' "); id. at 876, 102 S.Ct. at 2812-13, 73 L.Ed.2d at 452-53 (Blackmun, J., concurring in part and concurring in the judgment) ("Because of the essential function of schools, local education officials may attempt 'to promote civic virtues' and to 'awake[n] the child to cultural values.' "); Meltzer v. Board of Pub. Instruction, 548 F.2d 559, 579 (5th Cir.1977) (Gee, J., concurring in part and dissenting in part) ("The Constitution can hardly be read as commanding mentors to be neutral between virtue and vice in their pupils."), aff'd in part and rev'd in part, 577 F.2d 311, 312 (5th Cir.1978) (en banc) (per curiam)
 
 
 [23]
 No evidence suggests that the strong impression the majority thinks clergy volunteers make on students is any greater than the impression other volunteers make
 
 
 [24]
 Some cases have applied the religious-means-secular-ends test in assessing purpose, while others have used it to evaluate effect. Compare Lynch, 465 U.S. at 699, 104 S.Ct. at 1373, 79 L.Ed.2d at 626-27 (Brennan, J., dissenting) (discussing purpose) and Larkin v. Grendel's Den, Inc., 459 U.S. 116, 123-24, 103 S.Ct. 505, 510-11, 74 L.Ed.2d 297, 304-06 (1982) (discussing purpose) and Schempp, 374 U.S. at 223-24, 83 S.Ct. at 1572, 10 L.Ed.2d at 858-59 (discussing purpose) and Karen B. v. Treen, 653 F.2d 897, 901 (5th Cir. Unit A Aug.1981) (discussing purpose), aff'd, 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982) (mem.) with Allegheny, 492 U.S. at 618, 109 S.Ct. at 3114, 106 L.Ed.2d at 510 (Blackmun, J.) (citing Schempp, 374 U.S. at 295, 83 S.Ct. at 1610, 10 L.Ed.2d at 899-900 (Brennan, J., concurring)) (discussing effect) and Committee for Public Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 783 n. 39, 93 S.Ct. 2955, 2971 n. 39, 37 L.Ed.2d 948, 969 n. 39 (1973) (citing Schempp, 374 U.S. at 278-81, 83 S.Ct. at 1601-03, 10 L.Ed.2d at 890-92 (Brennan, J., concurring)) (discussing effect). This circumstance evinces uncertainty about the prong of the Lemon test to which the religious-means-secular-ends test relates. It does not indicate the existence of two distinct means-ends tests. See Hall v. Bradshaw, 630 F.2d 1018, 1020-21 (4th Cir.1980) (mentioning both the majority opinion and Justice Brennan's concurrence in Schempp in applying the religious-means-secular-ends test)
 
 
 [25]
 In Karen B. v. Treen, 653 F.2d 897, 901 (5th Cir. Unit A Aug.1981), aff'd, 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982) (mem.), one of our panels inferred the religious-means-secular-ends test from the portion of the majority opinion in School District of Abington Township, Pennsylvania v. Schempp, 374 U.S. 203, 223-24, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844, 858-59 (1963), where the Court rejected as disingenuous the claim that a Bible reading, without comment, at the start of each school day was intended to further secular purposes:
 [E]ven if its purpose is not strictly religious, it is sought to be accomplished through readings, without comment, from the Bible. Surely the place of the Bible as an instrument of religion cannot be gainsaid, and the State's recognition of the pervading religious character of the ceremony is evident from the rule's specific permission of the alternative use of the Catholic Douay version as well as the recent amendment permitting nonattendance at the exercises. None of these factors is consistent with the contention that the Bible is here used either as an instrument for nonreligious moral inspiration or as a reference for the teaching of secular subjects.
 
 
 [26]
 Justice Blackmun maintained that the religious-means-secular-ends test was just one factor to consider in reviewing a government policy or practice. See Allegheny, 492 U.S. at 618 n. 67, 109 S.Ct. at 3114 n. 67, 106 L.Ed.2d at 510 n. 67 (Blackmun, J.)
 
 
 [27]
 As noted earlier, the majority agrees that "government may play an active role in teaching civic values, virtues, and the communities' moral code, despite the fact that these values overlap with religious beliefs." Supra note 22
 
 
 [28]
 In Lemon, the Court focused on the character and purposes of the benefitted institutions, the nature of the state aid provided, and the resulting relationship between government and religion in deciding whether or not the entanglement was excessive. See Lemon v. Kurtzman, 403 U.S. 602, 615, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745, 757 (1971). These factors provide little assistance in this case, which does not concern government aid to religious groups, as Lemon did. See id. at 606-10, 91 S.Ct. at 2108-10, 29 L.Ed.2d at 752-54
 
 
 [29]
 The administrative and political concerns are not entirely unrelated. "[G]overnment participation in certain programs, whose very nature is apt to entangle the state in details of administration and planning, may escalate to the point of inviting undue [political] fragmentation." Walz v. Tax Comm'n, 397 U.S. 664, 695-96, 90 S.Ct. 1409, 1425, 25 L.Ed.2d 697, 716-17 (1970) (Harlan, J.)
 
 
 [30]
 Justice O'Connor treats excessive entanglement as an issue separate from endorsement. See Lynch, 465 U.S. at 687-89, 104 S.Ct. at 1367-68, 79 L.Ed.2d at 618-20 (O'Connor, J., concurring). She defines excessive entanglement as "institutional entanglement." Id. at 689, 104 S.Ct. at 1368, 79 L.Ed.2d at 620 (O'Connor, J., concurring). Therefore, in contrast to Lemon, she omits political divisiveness as an aspect of excessive entanglement. See id. at 689, 104 S.Ct. at 1367-68, 79 L.Ed.2d at 620 (O'Connor, J., concurring). She considers political divisiveness to be an indicator of the effect of the message that the government conveys. See id. at 689, 693, 104 S.Ct. at 1368, 1370, 79 L.Ed.2d at 620, 622-23 (O'Connor, J., concurring)
 We have adopted Justice O'Connor's understanding of excessive entanglement. See Jones v. Clear Creek Indep. Sch. Dist., 977 F.2d 963, 968 (5th Cir.1992). My prior discussion of excessive entanglement accords with her conception. In this regard, I note that Justice O'Connor wrote the Court's opinion in Agostini. See Agostini v. Felton, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997).
 
 
 [31]
 A non-subjective review of the summary judgment record reveals that the majority, to use its own words, "mischaracteriz[es]" the evidence. Several statements in the majority's response to this dissent exemplify this circumstance. According to the majority, Rabbi Hyman testified at the hearing on the motion for a TRO "that students had indicated to him that the 'Clergy in Schools' Program had made them feel uncomfortable." The majority cites this circumstance as proof that students know that the volunteers are clergy. However, Rabbi Hyman's testimony actually was the following:
 Q. You said that the program could make kids feel out of place. Do you have any evidence to show that--do you know of any kids that personally feel out of place because of this program or any indication or any evidence that the plaintiffs, the students, have felt out of place with this program?
 A. I've had some kids come up to me and say, "Why are they doing that?" I actually had one mother say--yes, I have.
 The question the students asked Rabbi Hyman is open to a number of equally plausible interpretations, including that it indicates unease with CIS. Because no other evidence provides the context necessary to determine what the students meant by the inquiry, the question is legally insufficient to show that students are uncomfortable with CIS. See City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 569 (11th Cir.1998) (finding memoranda open to equally plausible inferences legally insufficient by themselves to support claim); Transco Leasing Corp. v. United States, 896 F.2d 1435, 1445-46 (5th Cir.1990) (finding testimony that either or both of two pilots acted negligently sufficient to demonstrate the absence of an essential element of the contributory negligence defense). Therefore, the majority is incorrect in finding that Rabbi Hyman's testimony shows student "awareness that the volunteers [are] ... clergy."
 The majority also infers that students know that the volunteers are clergy from a "document [that] lists as a strength of the Program 'Students aware that ministers are aware of what's happening in schools.' " The document either was distributed or generated during the orientation session on the Program. However, the "Fact Sheet," which volunteers subsequently received, nowhere stated that the Program would make "[s]tudents aware that ministers are aware of what's happening in schools." The closest it came to such a statement was its recitation of the expectation that CIS would enable clergy to " be aware of what is happening in the schools." Moreover, the volunteers agreed not to disclose to students their religious ties. Finally, no student testified that he knew that the volunteers were clergy. Given these facts, a reasonable fact-finder could not infer that students know that the volunteers are clergy. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 213-14 (1986).
 Finally, the majority finds that a student "not wish[ing] to participate in the Program[ ] must so state in a classroom, where he is required to be present by State law, and which is filled with his peers, his teacher and the school official who has arrived without warning to shepherd him to the room full of clergy members." No evidence in the summary judgment record supports this finding. The majority seems to assume that the situation facing students asked to participate in a CIS session is like that which confronted the dissenting students in Schempp. Needless to say, nothing in the law of summary judgment approves of the making of such an assumption. See FED.R.CIV.P. 56(c); see also 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE §§ 2721-24 (3d ed.1998) (describing the materials that a court may consider in reviewing a summary judgment motion).